# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AMALGAMATED BANK, Trustee for the LongView LargeCap 500 Index Fund and LongView LargeCap 500 Index VEBA Fund, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 10774-VCL |
| | ) | |
| YAHOO! INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Date Submitted: November 5, 2015
Date Decided: February 2, 2016

Christine S. Azar, Ryan T. Keating, LABATON SUCHAROW LLP, Wilmington, Delaware; Thomas A. Dubbs, James W. Johnson, LABATON SUCHAROW LLP, New York, New York; *Counsel for Plaintiff Amalgamated Bank.*

Kathaleen S. McCormick, Richard J. Thomas, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Mark R.S. Foster, Su-Han Wang, MORRISON & FOERSTER LLP, San Francisco, California; *Counsel for Defendant Yahoo! Inc.*

**LASTER, Vice Chancellor.**

Plaintiff Amalgamated Bank ("Amalgamated") demanded to inspect the books and records of respondent Yahoo! Inc. pursuant to Section 220 of the Delaware General Corporation Law, 8 *Del. C.* § 220. Amalgamated's stated purpose was to investigate the hiring and subsequent firing of Yahoo's Chief Operating Officer, Henrique de Castro. This post-trial decision orders a tailored production of some of the documents identified in the demand. The production is subject to a condition: The resulting documents will be deemed incorporated by reference in any derivative complaint that Amalgamated may file relating to the subject matter of the demand.

## I.        FACTUAL BACKGROUND

A trial on a paper record took place on September 29, 2015. The following facts were proven by a preponderance of the evidence.

### A.    Change At Yahoo

2012 was a big year for Yahoo. Ten of the eleven members of the board of directors (the "Board") joined that year. The Board also reconstituted its Compensation and Leadership Development Committee (the "Committee"), comprising directors Maynard Webb, Sue James, Peter Ligouri, and Harry Wilson. Webb served as chair.

Change was afoot at the executive level as well. In July 2012, the Board hired Marissa Mayer as Yahoo's new CEO. Mayer previously worked at Google, Inc. as Vice President of Local, Maps, and Location Services.

Soon after taking over as CEO, Mayer received an email from Henrique de Castro. He was serving at Google as President of Media, Mobile, and Platforms. de Castro invited Mayer to dinner.

1

During dinner, de Castro expressed interest in serving as Mayer's number two executive at Yahoo. Mayer liked the idea, and she and de Castro began discussing his compensation package.

On September 12, 2012, the Committee held a special meeting. According to the minutes, Mayer raised the fact that she "was in discussions with a person to take the number two role." JX 5 at 1. The purpose of the meeting was to give Mayer "guidance on potential compensation parameters" to determine whether "it was feasible to have further discussions with the candidate." *Id.* She did not identify de Castro by name or state his current job or title, citing confidentiality concerns. She did tell the Committee that the candidate "would require a significant compensation package" given his talents and the money he would forfeit by leaving his existing employer. *Id.* Mayer described the candidate's expected compensation package as "$15 million per year (with $40 million as part of that up front in a four-year grant) and a $16 million or more make-whole payment." *Id.*

George B. Paulin of Frederic W. Cook & Co. was the Committee's compensation consultant. Paulin advised the Committee that the proposed compensation was "generally more than the data supported for a number two executive in peer companies." *Id.* at 2. He nevertheless opined that "regardless of the data, the Compensation Committee could justify this compensation," even though he still did not know the candidate's name. *Id.* The Committee authorized Mayer to continue negotiations "subject to Committee review of the actual contract." *Id.*

On September 23, 2012, the Committee met again. Mayer provided the Committee members with a term sheet summarizing the candidate's compensation package. The Committee still did not know the name of the candidate. Mayer emphasized the candidate's expertise in the display-ad market, which Mayer identified as an important area for Yahoo. The Committee authorized Mayer to continue negotiations. The Committee did not receive any materials that illustrated how the different compensation components in the term sheet interacted or how much compensation they would yield under different scenarios.

On September 24, 2012, the Committee met for a total of thirty minutes. During this meeting, the members finally learned that the candidate was de Castro. Mayer presented the Committee members with a letter offering de Castro the positions of Chief Operating Officer and Executive Vice President. JX 9 (the "Original Offer Letter"). The terms of the Original Offer Letter tracked the term sheet that the Committee had reviewed the previous day. The Committee again did not receive any materials that illustrated the complex interrelationships among the various compensation components or the amount of compensation they generate in particular scenarios.

The Committee approved the Original Offer Letter and gave Mayer authority to continue negotiating with de Castro. The Committee authorized Webb to approve any non-material changes to the Original Offer Letter. The Committee retained control over any "material changes," specifying that they would be "subject to approval by the full Committee." *Id.* at 3.

The Original Offer Letter contemplated that de Castro would receive the following forms of cash compensation:

- Base salary of $600,000.

- Annual bonus with a target value equal to 90% of base salary.

- Signing bonus of $1 million.

*Id.* at 1-2. In addition, the Original Offer Letter contemplated that de Castro would receive three different types of equity compensation (collectively, the "Equity Awards"). Each type of award had a target value and its own vesting schedule:

- The Incentive Restricted Stock Units (the "Incentive RSUs") had a target value of $20 million. The first 25% of the Incentive RSUs would vest on November 23, 2013. The remaining 75% would vest monthly in 36 equal installments over a three-year period, with 1/36 vesting one month after November 23, 2013, and each month thereafter.

- The Performance Stock Options (the "Options") had a target value of $20 million They were divided into four equal tranches with vesting dates of July 26, 2013, January 26, 2014, January 26, 2015, and January 26, 2016. This meant the first two tranches would vest in a little over a year, one approximately six months after de Castro would start at Yahoo and another six months after that. The next tranche would not vest for another year, after two years of service. The final tranche would vest a year after that, after three years of service.

- The Make-Whole Restricted Stock Units (the "Make-Whole RSUs") had a target value of $16 million. Beginning on December 23, 2012, they would vest equally in 48 monthly installments over a four-year period, with 1/48th vesting one month after the grant date and each month thereafter.

*Id.* at 3-6. The total target value of the Equity Awards was $56 million.

The Original Offer Letter contemplated two possible types of terminations: with cause and without cause. It detailed what de Castro would receive in each scenario.

4

If the termination was with cause, then de Castro would forfeit all of his unvested Equity Awards. The Original Offer Letter defined "Cause" as follows:

[T]ermination of your employment with the Company based upon the occurrence of one or more of the following . . . .

(1) your refusal or material failure to perform your job duties and responsibilities (other than by reason of your serious physical or mental illness, injury, or medical condition),

(2) your failure or refusal to comply in any material respect with material Company policies or lawful directives of the Company's Chief Executive Officer,

(3) your material breach of any contract or agreement between you and the Company (including but not limited to this letter agreement and any Employee Confidentiality and Assignment of Inventions Agreement or similar agreement between you and the Company), or your material breach of any statutory duty, fiduciary duty or any other obligation that you owe to the Company,

(4) your commission of an act of fraud, theft, embezzlement or other unlawful act against the Company or involving its property or assets,

(5) your engaging in unprofessional, unethical or other intentional acts that materially discredit the Company or are materially detrimental to the reputation, character or standing of the Company . . . ,

(6) your indictment or conviction or plea of *nolo contendere* or guilty plea with respect to any felony or crime of moral turpitude, or

(7) providing the Company with any knowingly false information regarding your current health condition, work experience or educational qualification . . . .

*Id.* at 19 (formatting into separate paragraphs added).

If the termination was without cause, then de Castro would keep all of the Equity Awards that had vested through his termination date, plus a portion of his unvested Equity Awards that would vest on an accelerated basis. The provisions of the Original

5

Offer Letter that governed the accelerated vesting were complex and differed for each type of Equity Award, so they take some time to describe.[1]

At a conceptual level, the provisions established a total number of Equity Awards that could vest, then cut back that amount based on a specified percentage. The terms for the accelerated vesting of the Incentive RSUs and the Options were less favorable to de Castro than the accelerated vesting for the Make-Whole RSUs, both in terms of the total number of awards that potentially could vest and the calculation of the cutback.

For purposes of the Incentive RSUs and the Options, the total potential number of awards that could vest on an accelerated basis was limited to the number "which would have vested in the six months following termination of employment" if the employee

---

[1] Scholars have questioned whether the increasing complexity of management compensation arrangements has contributed to the overall increase in management compensation, noting that (i) it is difficult and time-consuming to understand the various component parts and how they operate, and (ii) directors lack the time and arguably the expertise to parse through the agreements and map out the different scenarios. *See, e.g.*, Lucian Bebchuk & Jesse Fried, Pay Without Performance: The Unfulfilled Promise of Executive Compensation 37 (2004) (explaining that the complexity of compensation arrangements and the limited time that directors have leads them to "to rely on information and advice provided by the firm's human resources department and by compensation consultants hired by the department"); David I. Walker, *The Manager's Share*, 47 Wm. & Mary L. Rev. 587, 597 (2005) ("[T]he increasing complexity and opacity of executive compensation over the last two decades has contributed directly to the overall increase in managerial appropriation."); *see also* Bernice Grant, *Independent Yet Captured: Compensation Committee Independence After Dodd-Frank*, 65 Hastings L.J. 761, 788-97 (2014) (recommending continuing professional education requirements for compensation committee members to respond to complexity and sophistication of compensation arrangements and related regulatory environment); David I. Walker, *Evolving Executive Equity Compensation and the Limits of Optimal Contracting*, 64 Vand. L. Rev. 611, 655-56 (2011) (citing possible reasons for "the trimodal distribution of equity mix in recent years," including the possibility that "grants of multiple equity instruments could represent an effort to reduce transparency and the salience of individual elements of executive pay," and that "perhaps consultants profit from proposing more complex arrangements").

remained employed and met all required criteria (the "Six-Month Tail"). JX 9 at 8. Because the Incentive RSUs and the Options had different vesting schedules, the Six-Month Tail operated differently for those types of awards.

For the Incentive RSUs, an initial slug of twenty-five percent of the awards vested on November 23, 2013, one year and eleven days after the start of de Castro's employment. The Six-Month Tail meant that the accelerated vesting of the Incentive RSUs could result in either another 25% vesting or nothing, depending on de Castro's termination date. If he was terminated more than six months before November 23, 2013, then the Six-Month Tail would not pick up his initial 25% tranche. If he was terminated less than six months before November 23, 2013, then it would. The Six-Month Tail only had this binary effect for the initial 25% tranche. After the first slug, additional Incentive RSUs vested monthly in equal installments. If de Castro was terminated without cause after the first year, then the Six-Month Tail would sweep in another 12.5% of the total Incentive RSUs.[2]

For the Options, the vesting schedule contemplated four equal tranches. The first tranche vested a little more than six months after de Castro started working at Yahoo, and the next would vest approximately six months after that. Then the remaining two tranches would vest annually. Depending on when the termination took place, the Six-Month Tail

---

[2] The description in the text ignores a termination during the last six months of the employment period, when the number of units covered by the Six-Month Tail would decline proportionately with the number of months of employment that de Castro had left.

(i) would sweep in another tranche, if another vesting date would have occurred in the next six months, or (ii) produce nothing, if another vesting date was more than six months away. This meant the Six-Month Tail had a binary effect for the first, third, and fourth tranches.

The Six-Month Tail established the number of Incentive RSUs and Options that were eligible for accelerated vesting (the "Eligible Pool"). To determine the number of awards that actually vested, the Original Offer Letter called for multiplying the Incentive RSUs and Options in the Eligible Pool by a "Specified Percentage." This figure varied depending on how long de Castro had been with Yahoo: (i) 25% for a termination before November 23, 2013, (ii) 50% for a termination after November 23, 2013, and before November 23, 2014, (iii) 75% for a termination after November 23, 2014, and before November 23, 2015, and (iv) 100% for a termination after that.

The Make-Whole RSUs worked differently. First, they were not subject to the Six-Month Tail. All of the Make-Whole RSUs were part of the Eligible Pool. Second, the cutback percentage for the Make-Whole RSUs increased at a rate more favorable to de Castro than for the Incentive RSUs and Options: (i) 50% for a termination before November 23, 2013, (ii) 75% for a termination after November 23, 2013, and before November 23, 2014, (iii) 100% for a termination after that.

The compensation implications of the varying vesting schedules, the Six-Month Tail, and the Specified Percentage were not self-evident. When Mayer furnished the Original Offer Letter to the Committee, no one provided the directors with any materials that illustrated their consequences for different departure scenarios. Table 1 attempts to

8

illustrate the implications by identifying the specified percentage of each type of Equity Award that the Original Offer Letter stated would accelerate and vest. It then calculates an effective percentage of the total Equity Awards that de Castro would receive if terminated without cause on the specified date. The table illustrates the direction and order of magnitude of the accelerated vesting and the differences among the Equity Awards.

For an example of how Table 1 works, consider the Make-Whole RSUs. If Yahoo terminated de Castro on November 24, 2012, twenty-nine days before his first monthly grant, then none of his Make-Whole RSUs would have vested due to service, leaving 100% outstanding. The Original Offer Letter provided that 50% of the remaining amount would accelerate, so de Castro would receive the equivalent of 50% of the total grant. If de Castro was terminated on November 24, 2013, then he would have received 25% his Make-Whole RSUs through service, leaving 75% outstanding. The Original Offer Letter provided that 75% of the outstanding Make-Whole RSUs would accelerate, giving him an additional 56.25%. In total, de Castro would receive 81.25% of the grant. If de Castro was terminated on November 24, 2014, then he would have received 50% his Make-Whole RSUs through service, leaving 50% outstanding. The Original Offer Letter provided that 100% of those outstanding Make-Whole RSUs would accelerate, giving him an additional 50% of the all-in award. In total, de Castro would receive 100% of the grant. Footnotes to Table 1 explain the calculations for other cells.

9

| Table 1 | Make-Whole RSUs | | Incentive RSUs and Options | | |
|---|---|---|---|---|---|
| **Termination Date** | **% Of Remaining Awards To Accelerate** | **Effective % Of Total Received** | **Specified % Of Remaining Awards To Accelerate** | **Effective % Of Total Incentive RSUs Received** | **Effective % Of Total Options Received** |
| November 24, 2012 | 50% | 50% | 25% | 0%[3] | 0%[4] |
| November 24, 2013 | 75% | 81.25% | 50% | 31.25%[5] | 37.5%[6] |
| November 24, 2014 | 100% | 100% | 75% | 59.375%[7] | 68.75%[8] |
| November 24, 2015 | 100% | 100% | 100% | 87.5%[9] | 100%[10] |

---

[3] 0% already vested. Because the first tranche of Incentive RSUs would not vest until November 23, 2013, the Six-Month Tail would not capture any Incentive RSUs.

[4] 0% already vested. Because the first tranche of Options would not vest until July 26, 2013, the Six-Month Tail would not capture any Options.

[5] 25% already vested (*viz.*, the 25% that would vest on November 23, 2013). The Six-Month Tail captures another six monthly grants, creating an Eligible Pool of 12.5%. The Specified Percentage causes 50% of that to vest, or 6.25%.

[6] 25% already vested (*viz.*, the 25% slug that would vest on July 26, 2013). The Six-Month Tail captures the next 25% tranche of Options, which would vest on January 26, 2014. The Specified Percentage causes 50% of that to vest, or 12.5%.

[7] 50% already vested. The Six-Month Tail captures six monthly grants, creating an Eligible Pool of 12.5%. The Specified Percentage causes 75% of that to vest, or 9.375%.

[8] 50% already vested. The Six-Month Tail captures the next tranche of Options, which would vest on January 26, 2015. The Specified Percentage causes 75% of that to vest, or 18.75%.

[9] 75% already vested. The Six-Month Tail captures six monthly grants, creating an Eligible Pool of 12.5%. The Specified Percentage causes 100% of that to vest, or 12.5%.

[10] 75% already vested. The Six-Month Tail captures the final tranche of Options, which would vest on January 26, 2016. The Specified Percentage causes 100% of that to vest, so de Castro would get the full 25%.

The Committee did not have anything like Table 1, much less a helpful graph that would show the individual and aggregate effects of the Equity Awards over time. The Committee members only received a copy of the Original Offer Letter, and they spent a total of thirty minutes considering it.

After the Committee meeting, the full Board met "to review and discuss the appointment of Henrique de Castro as the Company's Chief Operating Officer." JX 10 at 1. Like the Committee, the Board received a copy of the Original Offer Letter. The Board did not receive any other materials. According to the minutes,

> Ms. Mayer described Mr. de Castro's background, including his current work role as President of worldwide business partnerships at Google, and also described potential visa issues related to his Portuguese citizenship. Mr. Mayer indicated that Mr. de Castro has a strong reputation for ethics and integrity, and has deep insights into the display ad market. Questions were asked and answered regarding, among other things, potential issues with Mr. de Castro's non-solicitation agreement with his current employer. A discussion followed.

*Id.* at 1-2.

Mayer then turned to Michael S. Sirkin of Proskauer Rose LLP, counsel to the Committee, and Webb, the Chair of the Committee.

> Mr. Sirkin summarized the major terms of the offer to Mr. de Castro, which currently includes $1 million in annual salary, a $4 million "makeup" equity grant, $5 million in time-based RSUs and $5 million in performance-based options. He also noted that there were some outstanding issues regarding the economics of the offer and certain restrictive covenants. Mr. Webb reported that the [Committee] had approved the current terms of the offer, and had delegated to him authorization [to] work with management on finalizing certain outstanding issues in the offer.

*Id.* at 2. The description the Board received did not capture the implications of accelerated vesting for various termination scenarios.

At this point, Yahoo's general counsel "reviewed the resolutions previously distributed to the Board in advance of the meeting." *Id.* The resolutions approved the concept of hiring de Castro "on substantially the terms presented to the Board." *Id.* at 3. They also authorized Yahoo's officers "to execute and deliver the [Original] Offer Letter substantially in the form attached hereto . . . with such administrative or non-material changes to the [Original] Offer Letter as such officers, in conjunction with Maynard Webb, chair of the Compensation Committee, may deem necessary or appropriate." *Id.* The Board approved the resolutions.

## C.    The Committee Eliminates The "Specified Percentage" Concept.

de Castro was not happy with the Original Offer Letter. He wanted accelerated vesting for a larger number of Incentive RSUs and Options if he was terminated without cause. The Original Offer Letter used the Six-Month Tail to determine the Eligible Pool. de Castro wanted the tail period extended to twelve months (the "Twelve-Month Tail"), and he did not want the number of additional awards that vested during the tail period to be cut back by the Specified Percentage.

On October 13, 2012, the Committee met to receive a report on the status of the negotiations with de Castro. Counsel noted that the Committee "had previously approved proposed terms of employment . . . and had delegated to Mr. Webb authority to approve changes [to] such terms, with the understanding that any material changes would be presented to the Committee for approval." JX 12 at 1-2. At this point, Mayer described what the Committee ostensibly had approved previously, but she *incorrectly* described "[t]he terms previously approved by the Committee" as having "provided for 12-months

12

acceleration of a 'Specified Percentage.'" *Id.* at 2. In other words, she represented to the Committee that the Original Offer Letter already contained a Twelve-Month Tail.

Mayer framed the issue for the Committee to decide as whether the concept of the Specified Percentage should be removed. Mayer represented to the Committee that "the Candidate had understood that he would receive 12 months acceleration of all equity, regardless of when the termination event occurred." *Id.* at 2.

The Committee discussed the issue as Mayer had framed it, *viz.*, eliminating the Specified Percentage based on the incorrect assumption that the Committee already had approved a Twelve-Month Tail. During the discussion,

> it was noted that the Candidate was a very important executive hire, as reflected in his generous compensation package. Mr. Paulin described a worst case scenario that might arise as a consequence of making the requested changes to the employment terms: specifically, that an early termination in the first year would trigger a very large payout to the Candidate. Mr. Paulin noted that it is likely that the large potential payout to the Candidate, as well as the general size of the contract, already would attract negative reaction from proxy advisors, and that the increased amount would just add to that unless the Company stock has significantly increased in price by the time of the proxy vote.

*Id.* at 2-3.

The Committee did not receive any materials that attempted to quantify the effect of the changes or illustrate how they altered the compensation payouts under different scenarios. There is no evidence that anyone addressed the magnitude of the change, whether based on the incorrect assumption that the baseline was a Twelve-Month Tail or the actuality that the baseline was the Six-Month Tail.

13

Mayer expressed her view that "while she believed that the payout was already significant and was concerned about the increase, her concerns was [sic] less in the termination without cause scenario since that will be under her and the Board's control." *Id.* at 3. There is no evidence that anyone examined the definition of cause in the context of Mayer's comment.

After further discussion, Mayer asked that the Committee "approve removing the concept of 'Specified Percentage' in the event of termination without cause." *Id.* "The Committee approved the requested changes." *Id.* At no point during the meeting did anyone discuss changing the vesting schedule for the Make-Whole RSUs.

**D.      Mayer Makes More Changes To The Offer Letter.**

After the Committee meeting, Mayer prepared a final version of the offer letter, which she provided to de Castro. JX 13 (the "Final Offer Letter"). She made at least three changes that materially increased de Castro's compensation package.

The first change increased the tail period from six months to twelve months, which doubled the effective percentages of the Incentive RSUs and Options that de Castro would receive if terminated without cause. The Twelve-Month Tail was not something the Committee ever approved. Mayer incorrectly represented to the Committee that the Original Offer Letter already had a Twelve-Month Tail, so the Committee never evaluated it.

Second, Mayer eliminated the Specified Percentage for the Incentive RSUs and Options. That was consistent with what the Committee had approved, albeit based on a misunderstanding about the existing tail period.

14

Third, Mayer eliminated the time-weighted schedule for accelerated vesting for the Make-Whole RSUs. She provided instead that 100% of the grant would accelerate if Yahoo terminated de Castro without cause. This last change was never discussed with the Committee, much less approved.

Table 2 compares the effective percentages of Equity Awards that de Castro would receive using the accelerated vesting as structured in the Original Offer Letter (as shown in Table 1) with the effective percentages using the accelerated vesting as structured in the Final Offer Letter. As with Table 1, it uses hypothetical termination dates to illustrate the direction and magnitude of the changes.

| Table 2 | Make-Whole RSUs | | Incentive RSUs | | Options | |
|---|---|---|---|---|---|---|
| Termination Date | Original | Final | Original | Final[11] | Original | Final |
| November 24, 2012 | 50% | 100% | 0% | 25% | 0% | 25%[12] |
| November 24, 2013 | 81.25% | 100% | 31.25% | 50% | 37.5% | 50%[13] |
| November 24, 2014 | 100% | 100% | 59.375% | 75% | 68.75% | 75%[14] |
| November 24, 2015 | 100% | 100% | 87.5% | 100% | 100% | 100%[15] |

As the table shows, Mayer's changes substantially increased the percentage of the Equity Awards that de Castro would receive for an early termination.

Finally, Mayer reallocated the amount of target value conveyed through the different types of Equity Awards. She increased the target value of the Make-Whole RSUs from $16 million to $20 million. She simultaneously decreased the value of the Incentive RSUs and Options from $20 million each ($40 million total) to $18 million each ($36 million total). These changes were never discussed with the Committee, much less approved.

Mayer's changes did not affect the target value of the aggregate grant, which remained at $56 million, but they did affect de Castro's incentives and the size of his

[11] The Twelve-Month Tail always captures another 25%. The percentages increase because an additional 25% of de Castro's Incentive RSUs vest each year through service.

[12] 0% vested. Twelve-Month Tail captures the initial tranche of 25%. No cut-back.

[13] 25% vested. Twelve-Month Tail captures the next tranche of 25%. No cut-back.

[14] 50% vested. Twelve-Month Tail captures the third tranche of 25%. No cut-back.

[15] 75% vested. Twelve-Month Tail captures the final tranche of 25%. No cut-back.

payout if he was terminated without cause. Because of the other changes Mayer had made, de Castro would receive 100% of his Make-Whole RSUs if he was terminated without cause, but only an additional twelve months of Incentive RSUs and Options. Shifting value from the Incentive RSUs and Options to the Make-Whole RSUs benefited de Castro by moving value into a category of Equity Award that would accelerate fully. It also benefited de Castro because the Options had performance-vesting metrics that had to be met, while the Make-Whole RSUs did not. The shifts worked with Mayer's other changes to increase substantially the value of the Equity Awards that de Castro would receive for an early termination.

Table 3 compares the different categories of value conveyed to de Castro under the Original Offer Letter versus the Final Offer Letter. The figures reflect the total value of the vested portion of the Equity Award that de Castro would receive if terminated without cause, including both what de Castro would have received from prior service and the additional amounts from accelerated vesting. The calculations use the target value of the awards and the percentages calculated in Tables 1 and 2. Amounts are in millions.

| Table 3 | Make-Whole RSUs | | Incentive RSUs | | Options | | Total | |
|---|---|---|---|---|---|---|---|---|
| Termination Date | Original ($16) | Final ($20) | Original ($20) | Final ($18) | Original ($20) | Final ($18M) | Original ($56M) | Final ($56M) |
| November 24, 2012 | $8 | $20 | $0 | $4.5 | $0 | $4.5 | $8 | $29 |
| November 24, 2013 | $13 | $20 | $6.25 | $9 | $7.5 | $9 | $26.75 | $38 |
| November 24, 2014 | $16 | $20 | $11.875 | $13.5 | $13.75 | $13.5 | $41.625 | $47 |
| November 24, 2015 | $16 | $20 | $17.50 | $18 | $20 | $18 | $53.5 | $56 |

18

Tables 4 compares the Original Offer Letter and the Final Offer Letter by focusing on the amount of target compensation that de Castro would receive due to accelerated vesting. Table 4 reflects the percentage of the Equity Awards that de Castro would receive as severance. The calculation excludes Equity Awards that de Castro already would have received through service as of the date of termination.

| Table 4 | Make-Whole RSUs | | Incentive RSUs | | Options | |
|---|---|---|---|---|---|---|
| Termination Date | Original | Final[16] | Original | Final[17] | Original | Final[18] |
| November 24, 2012 | 50% | 100% | 0% | 25% | 0% | 25% |
| November 24, 2013 | 56.25% | 75% | 6.25% | 25% | 12.5% | 25% |
| November 24, 2014 | 50% | 50% | 9.375% | 25% | 18.75% | 25% |
| November 24, 2015 | 25% | 25% | 12.5% | 25% | 25% | 25% |

---

[16] 100% of the remaining percentage vests. The remaining percentage declines because the balance has vested due to prior service as of the termination date.

[17] The Twelve-Month Tail always captures another 25%.

[18] For purposes of this table, the Twelve-Month Tail always captures another 25%. For a termination between January 26, 2013, and July 26, 2013, however, the Twelve-Month Tail would sweep in the first two tranches of options for 50% of the total grant.

Table 5 reflects the total dollar amounts de Castro would receive as severance. The calculations are based on the target value of the Equity Awards and the percentages from Table 4.

| Table 5 | Make-Whole RSUs | | Incentive RSUs | | Options | | Total | |
|---|---|---|---|---|---|---|---|---|
| Termina-tion Date | Original ($16) | Final ($20) | Original ($20) | Final ($18) | Original ($20) | Final ($18M) | Original ($56M) | Final ($56M) |
| November 24, 2012 | $8 | $20 | $0 | $4.5 | $0 | $4.5 | $8 | $29 |
| November 24, 2013 | $9 | $15 | $1.25 | $4.5 | $2.5 | $4.5 | $12.75 | $24 |
| November 24, 2014 | $8 | $10 | $1.875 | $4.5 | $3.75 | $4.5 | $13.625 | $19 |
| November 24, 2015 | $4 | $5 | $2.5 | $4.5 | $5 | $4.5 | $11.5 | $14 |

Mayer's changes thus resulted in payouts that made earlier termination without cause dramatically more favorable to de Castro. For a termination on November 24, 2012, after twelve days of service, her changes increased the value of his payout by $21 million, or 263%. For a termination on November 24, 2013, after one year and twelve days of service, her changes increased the value of his payout by $11.25 million, or 94%.

The categories of Equity Awards that provided de Castro with his increased payout each contained elements that the Committee had never approved, had approved based on incorrect information, or both. The final terms of the Make-Whole RSUs incorporated 100% vesting for a termination without cause and the incremental value that Mayer reallocated. The Committee never approved either change. The final terms of the Incentive RSUs and the Options used the Twelve-Month Tail, which the Committee never considered because Mayer told the directors incorrectly that the Original Offer Letter already included a Twelve-Month Tail. The final terms of the Incentive RSUs and

20

the Options also eliminated the Specified Percentage, which the Committee approved based on the incorrect assumption that the Original Offer Letter already included the Twelve-Month Tail. The Committee never received any calculations showing the value of the changes, much less the aggregate effect of all of the changes.

**E.      Yahoo Hires De Castro.**

On October 15, 2012, de Castro executed the Final Offer Letter, and Yahoo issued a press release announcing the hiring. In the press release, Mayer cited de Castro's expertise in "Internet advertising and his proven success in structuring and scaling global organizations." JX 14 at 1.

That same day Yahoo issued a Form 8-K that attached the Final Offer Letter. Public reception was mixed to negative. The Wall Street Journal described the compensation package as "staggering." JX 16 at 1. The Business Insider ran an article titled, "Did Marissa Mayer Just Make a Horrible Mistake? Several Ex-Googlers Think So." JX 17 at 1. It cited sources from Google who expressed generally negative reviews of de Castro's competence and personality. One source stated that "Google should pay Yahoo to take him." JX 17 at 3. Another described him as the "literally the worst hire ever." *Id.* at 4. The sources who praised de Castro as smart and disciplined nevertheless questioned his ability to get along with others.

**F.      Mayer Fires De Castro.**

On November 12, 2012, de Castro started at Yahoo. His pay package for his first year was $39.2 million, making him the eighth-highest paid executive in Silicon Valley.

In all of the United States, only eight CEOs of public companies earned more than $39.2 million in 2013. He even made more than Mayer.

de Castro's responsibilities included running "sales, operations, media and business development functions." JX 15 at 6. Mayer expected him to boost Yahoo's revenue by expanding the scope of its digital advertising. A key part of his job was building relationships with big advertisers.

de Castro did not perform. In every quarter after he started, Yahoo's advertising revenue declined. de Castro also did not get along well with Yahoo management. Within a year of hiring him, Mayer personally took control of de Castro's advertising team.

In January 2014, fourteen months after de Castro started as COO, Mayer decided to fire him. The Committee approved her decision through action by written consent dated January 12, 2014. The resolutions stated:

> **WHEREAS**, management has discussed with the Committee the termination without cause of the employment of Henrique de Castro, Chief Operating Officer of the Company, effective on or about January 14, 2014, and that in connection with such termination, Mr. de Castro will receive the severance benefits for a termination without cause provided for in his employment offer letter with the Company, dated October 15, 2012, his Severance Agreement with the Company, dated February 28, 2013, and his Company equity award agreements (collectively the "Agreements");
>
> **NOW, THEREFORE, BE IT RESOLVED**, that, the Committee hereby approves the termination without cause of the employment of Henrique de Castro and the payment of the severance benefits provided for in the Agreements . . . .

JX 25 at 1.

The Committee did not actually meet in person or by phone. There is no evidence of what information the Committee had, other than the vague reference in the resolution

to management having "discussed with the Committee the termination without cause." There is no evidence that the Committee evaluated the alternative of a for-cause termination or was provided with a calculation of the severance benefits that de Castro would receive.

In an internal memo to Yahoo employees, Mayer took responsibility for the firing, stating: "I made the difficult decision that our COO, Henrique de Castro, should leave the company." JX 27 at 2. On January 15, 2014, Yahoo filed a Form 8-K announcing simply that de Castro was "leaving the Company" and would receive "severance benefits provided for in his [Final] Offer Letter." JX 29 at 3.

The media provided extensive coverage of the termination. A New York Times article attributed de Castro's termination to poor performance. JX 28. Another described his pay package as "stratospheric" "[e]ven by Silicon Valley standards." JX 31 at 1.

Investors reacted negatively. The CtW Investment Group was an organization that represented union pension funds owning own approximately 2 million shares of Yahoo. CtW "called on Yahoo to take steps to ensure it won't overpay for executive talent." JX 34 at 1. CtW also called on Mayer to resign from her position as a director of Wal-Mart Stores, Inc. and questioned Yahoo's decision to pay de Castro a make-whole bonus.

## G.    The Payout

On February 4, 2014, the Committee met for the first time since de Castro's termination. His unvested Options had performance vesting criteria that had to be met. Based on the Company's performance, the Committee "certifie[d] that the portion of the full year 2013 tranches of the Performance Options that shall vest is: 79%." JX 33 at 3.

23

The Committee also discussed the level of bonus that should be paid to the five members of senior management who participated in the Executive Incentive Plan, including Mayer and de Castro.

The Committee met again on February 27, 2014. Despite having approved de Castro's termination without cause via action by written consent on January 12, this meeting was the first time the Committee discussed the reasons for his termination. Mayer explained that "de Castro had not achieved his revenue or operational objectives, including those with respect to advertisers. Overall he had not performed to the desired level . . . [and] she had given him feedback on the deficiencies in his performance and he still failed to correct or improve his performance." JX 36 at 7. The Committee decided not to award de Castro a bonus under the Executive Incentive Plan.

On April 16, 2014, in the proxy statement for its annual meeting, Yahoo finally disclosed to its stockholders that de Castro had been terminated without cause, triggering $59.96 million in severance. The payout comprised the following amounts:

- $1.14 million in cash, representing his base salary for twelve months ($600,000) plus a target annual bonus equal to 90% of his base salary ($540,000).

- $9.62 million in value from the accelerated vesting of 238,474 Incentive RSUs, representing the additional 25% of the remaining Incentive RSUs that would have vested within twelve months after his termination date.

- $16.02 million in value from the accelerated vesting of Options to acquire 746,362 shares of common stock, representing 79% of the additional 25% of the remaining Options that would have vested within twelve months after his termination date.

- $31.18 million from the accelerated vesting of 772,832 Make-Whole RSUs, representing 100% of the original award.

24

JX 39 at 82-83. If Yahoo had terminated de Castro for cause, he would have forfeited his unvested Equity Awards.

Based on the target value of the Equity Awards, their anticipated value for a termination in early January 2014 was $23.58 million (versus $11.25 million under the Original Offer Letter). Combined with his cash severance of one year base salary plus bonus, the anticipated value of the total severance package was around $24.72 million.[19]

de Castro's actual severance payout was nearly $60 million, with the difference driven by an increase in Yahoo's stock price from $15.68 to $40.34 during the fourteen months that he was employed. The bulk of that increase was attributable to Yahoo's investment in Alibaba Group Holding Limited, an e-commerce company based in China.

At the 2014 annual meeting, Yahoo held its advisory say-on-pay vote. Holders of 71% of Yahoo's outstanding shares voted in favor of Yahoo's executive compensation plan. Of the shares present or represented by proxy, 92% voted in favor.

## H. Amalgamated Makes A Section 220 Demand.

Meanwhile, on February 24, 2014, Amalgamated served a demand on Yahoo for books and records. *See* JX 35 (the "Demand"). Amalgamated contended that it had a legally recognized purpose for exploring these matters, namely the "investigation of potential mismanagement, including mismanagement in connection with the payment of

---

[19] These estimates deploy the same methodology as Tables 4 and 5. The principal difference between a termination on November 24, 2013, and in early January 2014 is that another month of the Make-Whole RSUs would have vested. Under the Final Offer Letter, this reduces the amount of Make-Whole RSUs subject to accelerated vesting by 1/36, with a target value of $416,666.

25

compensation to a corporation's officers and directors." *Id.* at 2. The Demand recited some of the facts surrounding de Castro's hiring and firing. *Id.* at 2-3. The Demand asked for five categories of documents and provided ten illustrative subcategories that it identified as falling under the first category. The specific requests appear and are addressed in the Legal Analysis, *infra*.

On March 3, 2014, Yahoo rejected the Demand. Yahoo took the position that (i) Amalgamated's documentation of its share ownership did not strictly comply with Section 220; (ii) Amalgamated lacked authority to make the demand; (iii) the Demand did not identify a credible basis to infer wrongdoing; and (iv) the scope of the inspection was overly broad. Compl. Ex. B at 1-2. Yahoo agreed to "allow an appropriate inspection of its books and records, consistent with section 220" so long as Amalgamated addressed Yahoo's concerns and executed a confidentiality agreement. *Id.* at 3.

On March 13, 2014, Amalgamated provided Yahoo with additional documentation evidencing its ownership of Yahoo stock. The documents consisted of account statements for two of the funds for which Amalgamated served as trustee, demonstrating that the funds held Yahoo stock from January 2012 through the date of the Demand. After that, until this litigation was filed, Yahoo did not contest Amalgamated's standing to make a Section 220 demand.

On May 14, 2014, Yahoo offered to provide Amalgamated "board-level materials–minutes and attachments, resolutions, presentations, and reports–reflecting decisions or discussions by the [Board] (including committees) about considering, recommending, or approving, the appointment, compensation, severance, or termination of [de Castro]."

26

Compl. Ex. D at 1 (the "Board-Level Materials"). In response, Amalgamated sought to clarify whether the Board-Level Materials included documents that Mayer had reviewed, but which the full Board or a committee had not reviewed. Yahoo declined to provide any documents other than what the Board or a committee had reviewed. The record at trial established that the Board-Level Materials did not include documents that Mayer had reviewed, but which the full Board or a committee had not reviewed.

On August 12, 2014, Amalgamated accepted Yahoo's proposed document production while reserving its right to file suit to compel the production of additional documents. On September 12, 2014, Amalgamated and Yahoo entered into a confidentiality agreement. On September 17, 2014, Yahoo produced 677 pages of documents. The production included minutes and materials from sixteen meetings of the Board or the Committee between September 2012 and February 2014 that related to the hiring, compensation, or termination of de Castro. The production also contained comparative executive compensation data, drafts of the offer letters that the directors had considered, and the final agreements between de Castro and Yahoo. Although Yahoo had declined to answer Amalgamated's question about the scope of what it considered Board-Level Materials, the production in fact did not include documents that Mayer reviewed that had not gone to the full Board or a committee.

On October 14, 2014, Amalgamated requested eleven more categories of documents. Yahoo denied the request because it did not believe Amalgamated had a credible basis to infer wrongdoing or that the new categories were necessary or essential to its stated purpose. On March 10, 2015, Amalgamated filed this action.

## II.     LEGAL ANALYSIS

Section 220(b) of the Delaware General Corporation Law provides as follows:

> Any stockholder, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose, and to make copies and extracts from: (1) The corporation's stock ledger, a list of its stockholders, and its other books and records . . . .

8 *Del. C.* § 220(b). "The Section 220 demand for books and records under the Delaware General Corporation Law serves many salutary goals in the corporate governance landscape, but the burden on the plaintiff is not insubstantial." *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 565 (Del. 1997).

To obtain books and records under Section 220(b), the plaintiff must establish by a preponderance of the evidence that the plaintiff (i) is a stockholder, (ii) complied with statutory requirements specifying the form and manner for making a demand, and (iii) possesses a proper purpose for conducting the inspection. *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 144 (Del. 2012). After meeting these requirements, the plaintiff must demonstrate by a preponderance of the evidence that "each category of books and records is essential" to the plaintiff's purpose. *Sec. First*, 687 A.2d at 569.

Once the plaintiff has made the necessary showing, the court must determine the scope of the inspection. The order should permit access to books and records that are "essential" for the plaintiff to achieve its purpose, but should stop at the quantum of information that the court deems "sufficient." *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996). The production order "must be carefully tailored." *Sec. First*, 687 A.2d at 565. Framed metaphorically, it should be "circumscribed with rifled

28

precision" to target the plaintiff's proper purpose. *Id.* at 570. It should not be a sawed-off shotgun blast.

## A.     The Form And Manner Requirements

If the party seeking books and records is not a record holder of the corporation's stock, then Section 220 requires that the demand attach *prima facie* evidence that the party making the demand is either a beneficial owner or a duly empowered agent acting on behalf of a record holder or beneficial owner. The statutory language states:

> In every instance where the stockholder is other than a record holder of stock in a stock corporation, . . . the demand under oath shall [1] state the person's status as a stockholder, [2] be accompanied by documentary evidence of beneficial ownership of the stock, and [3] state that such documentary evidence is a true and correct copy of what it purports to be.

8 *Del. C.* § 220(b) (enumeration added). "Delaware courts require strict adherence to the section 220 inspection demand procedural requirements." *Cent. Laborers*, 45 A.3d at 145. "Strict adherence to the section 220 procedural requirements for making an inspection demand protects the right of the corporation to receive and consider a demand in *proper form before litigation is initiated*." *Id.* at 146 (quotation marks omitted).

In this case, Amalgamated satisfied the statutory requirements by (i) stating in the Demand, under oath, that the LongView LargeCap 500 Index Fund and the LongView LargeCap 500 Index Fund Veba (together, the "Funds") owned shares of Yahoo common stock, (ii) providing documentary evidence supporting the Funds' ownership at a point proximate to the date of the Demand and stating in the Demand, under oath, that the documentation was what it appeared to be, and (iii) stating in the Demand, under oath,

29

that Amalgamated was acting as the trustee of the Funds for purposes of making the Demand. *See* JX 35 at 1, 7.

Yahoo correctly observes that the Demand attached account statements reflecting the Funds' ownership of Yahoo common stock as of February 21, 2014, three days *before* the date of the Demand. According to Yahoo, this is statutorily inadequate because the date of the account statements is not the same as the date of the Demand. Yahoo also observes that the Funds did not continually update their documentation to provide evidence of their continuing ownership of Yahoo common stock. Neither observation provides a valid basis for defeating an inspection.

Section 220 must be applied with some appreciation of the practical considerations surrounding its use. It takes a non-trivial amount of time to obtain documentation evidencing stockholder status. The most commonly used method is account statements, which are issued periodically. If Section 220 truly required evidence of stock ownership as of the moment that the demand was sent, then a stockholder could not comply without some form of same-day record. In my view, requiring that level of documentation would be an unreasonable reading of the statute. What Section 220 instead requires is documentation sufficiently proximate in time to the date of the demand as to be consistent with and corroborate the averment of stock ownership made in the demand itself. Recent brokerage statements are adequate. *See Paul v. China MediaExpress Hldgs., Inc.*, 2012 WL 28818, at *3 n.19 (Del. Ch. Jan. 5, 2012). In this case, evidence of the Funds' ownership dated a few days before the Demand certainly sufficed.

Amalgamated and the Funds also were not required to provide Yahoo with an ongoing stream of daily trading and ownership records confirming their continuing stock ownership. The plain language of the statute only requires evidence that the demanding party is a stockholder at the time of the demand. *See* 8 *Del C.* § 220(b). The statute does not require a continuing showing, which would be impractical and overly burdensome for both the party making the demand and for the company responding to it. No one wants to send or receive a box of daily account statements covering a period of months (except perhaps a law firm paid by the hour to assemble or review them).

Nevertheless, the use of Section 220 carries with it an implicit obligation on the part of the demanding party to advise the company if it loses its status as a stockholder or its authority to act on behalf of a stockholder. In an appropriate case, a court might well impose a remedy on an erstwhile stockholder or a once-but-no-longer-authorized agent that continued to use Section 220 under false pretenses. That was not the case here.

Finally, Amalgamated established its authority to act on behalf of the Funds by averring under oath that it acted as the trustee for the Funds. This court has held that similarly situated business principals need not provide documentary support to confirm their apparent authority to act on behalf of an entity. "A general partner in a limited partnership needs no written power of attorney to act on behalf of the limited partnership. Similarly, the president of a corporation can make a demand on behalf of the corporation without supplying written authorization or a board of directors' resolution." 1 Welch et al., *Folk on the Delaware General Corporation Law* § 220.02, at 7-209 (6th ed. 2015) (citing *Odyssey P'rs v. Trans World Corp.*, 1983 WL 18011, at *1 (Del. Ch. Mar. 29,

31

1983), and *Agency Rent-A-Car, Inc. v. Gateway Indus., Inc.*, 1980 WL 3040, at \*4-7 (Del. Ch. July 21, 1980) (footnote omitted)). The trustee for an index fund has analogous authority. In this case, Amalgamated even provided decisions by this court recognizing its authority to make Section 220 demands on behalf of funds for which it served as trustee.[20] Amalgamated satisfied the form and manner requirements.

## B.    Amalgamated's Proper Purposes

A party seeking to inspect books and records must have a proper purpose. In the language of the statute, "[a] proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder." 8 *Del. C.* § 220(b).

Amalgamated's Demand described the purposes for the inspection as follows:

Amalgamated is making this Demand to: (1) investigate Yahoo's payment of what appears to be excessive compensation to Yahoo's former Chief Operating Officer ("COO"), Henrique de Castro ("Mr. de Castro"); (2) assess the independence of the non-management members of Yahoo's Board, including the members of the Compensation and Leadership Development Committee (the "Compensation Committee"), who would

---

[20] *See Amalgamated Bank v. Dauphin Cty. Empls. Ret. Fund*, 61 A.3d 617, at \*1 n.2 (Del. 2013) (TABLE) (describing "Amalgamated Bank, as Trustee for the LongView LargeCap 500 Index Fund [and] LongView LargeCap 500 Index VEBA Fund" as a "shareholder" where Amalgamated requested postponement of derivative action while it completed a parallel Section 220 action); *In re Freeport-McMoRan Cooper & Cold Inc. Deriv. Litig.*, 2013 WL 616296, at \*1 n.1 (Del. Ch. Feb. 14, 2013) (granting motion to intervene in Section 220 action filed by "Amalgamated Bank, as Trustee for the LongView LargeCap 500 Index Fund [and the] LongView LargeCap 500 Index VEBA Fund"); *Amalgamated Bank v. NetApp, Inc.*, 2012 WL 379908, at \*1 (Del. Ch. Feb. 6, 2012) ("Amalgamated Bank, as Trustee of the LongView Funds . . . , is a NetApp, Inc., stockholder . . . ."); *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 571 n.4 (Del. Ch. 2007) ("Amalgamated's shareholder standing derives from its trusteeship of the LongView MidCap 400 Index Fund."); *see also China MediaExpress*, 2012 WL 28818, at 3 n.19 (dismissing form and manner claim after plaintiff produced evidence of stock ownership at trial).

have approved any compensation paid to Mr. de Castro; and (3) investigate the circumstances surrounding Mr. de Castro's departure from the Company.

JX 35 at 1-2. The Demand summarized Amalgamated's reasons for believing de Castro's compensation resulted from mismanagement or constituted waste.

### 1.     Investigating Wrongdoing Or Mismanagement

"[A] stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.'" *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006). To conduct an inspection, a stockholder "is not required to prove by a preponderance of the evidence that waste and mismanagement are actually occurring."[21] A stockholder "need only show, by a preponderance of the evidence, a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation."[22] A showing that is sufficient to conduct an inspection "may ultimately

---

[21] *Id.* at 123 (alteration and quotation marks omitted); *accord City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 1 A.3d 281, 286-87 (Del. 2010) ("Such evidence need not prove that wrongdoing, in fact, occurred."); *Sec. First*, 687 A.2d at 565 ("The stockholder need not actually prove the wrongdoing itself by a preponderance of the evidence."); *id.* at 567 ("The actual wrongdoing itself need not be proved in a Section 220 proceeding, however."); *Thomas & Betts*, 681 A.2d at 1031 ("[Stockholders] are not required to prove by a preponderance of the evidence that waste and [mis]management are actually occurring.").

[22] *Seinfeld*, 909 A.2d at 123; *accord Axcelis*, 1 A.3d at 286-87 ("[A] plaintiff seeking inspection of books and records must present some evidence, through documents, logic, testimony or otherwise, to suggest a credible basis from which the Court of Chancery could infer that wrongdoing may have occurred." (quotation marks and footnote omitted)); *id.* at 287 ("To obtain Section 220 relief based on [investigating possible wrongdoing or mismanagement], the plaintiff-stockholder must present some evidence to suggest a credible basis from which a court could infer possible mismanagement that would warrant further investigation." (quotation marks omitted)); *Thomas & Betts*, 681 A.2d at 1031 ("[A] stockholder must present some credible basis from which the court can infer that waste or mismanagement may have occurred.").

33

fall well short of demonstrating that anything wrong occurred." *Seinfeld*, 909 A.2d at 123 (quotation marks omitted).

"[T]he 'credible basis' standard sets the lowest possible burden of proof." *Id.* The "threshold may be satisfied by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing." *Id.* at 123 (quotation marks omitted); *accord Sec. First*, 687 A.2d at 568. The trial court may rely on "circumstantial evidence." *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1273 (Del. 2014). Hearsay statements may be considered, provided they are sufficiently reliable.[23]

In this case, Amalgamated established a credible basis to suspect wrongdoing in connection with de Castro's hiring and firing. The possible wrongdoing may fall under the headings of breach of fiduciary duty or waste.

### a. Possible Breach of Fiduciary Duty

Mark Twain is often credited (perhaps erroneously) with observing that history may not repeat itself, but it often rhymes. The credible basis for concern about wrongdoing at Yahoo evokes the *Disney* case, with the details updated for a twenty-first century, New Economy company. Like the current scenario, *Disney* involved a CEO hiring a number-two executive for munificent compensation, poor performance by the

---

[23] *See Thomas & Betts*, 681 A.2d at 1032-33; *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *4 (Del. Ch. Apr. 28, 2004); *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 208-13 (Del. Ch. 1976).

number-two executive, and a no-fault termination after approximately a year on the job that conferred dynastic wealth on the executive under circumstances where a for-cause termination could have been justified. Certainly there are factual distinctions, but the assonance is there.

The *Disney* saga began with a complaint filed without the benefit of a Section 220 inspection. Chancellor Chandler dismissed the complaint for failing to plead with particularity that demand was futile. *In re Walt Disney Co. Deriv. Litig. (Disney I)*, 731 A.2d 342, 351 (Del. Ch. 1998) (subsequent history omitted). On appeal, the Delaware Supreme Court affirmed the Chancellor's legal analysis, but noted that the facts presented "a very troubling case on the merits." *Brehm v. Eisner (Disney II)*, 746 A.2d 244, 249 (Del. 2000).

> On the one hand, it appears from the Complaint that: (a) the compensation and termination payout for Ovitz were exceedingly lucrative, if not luxurious, compared to Ovitz' value to the Company; and (b) the processes of the boards of directors in dealing with the approval and termination of the Ovitz Employment Agreement were casual, if not sloppy and perfunctory. On the other hand, the Complaint is so inartfully drafted that it was properly dismissed under our pleading standards for derivative suits. From what we can ferret out of this deficient pleading, the processes of the Old Board and the New Board were hardly paradigms of good corporate governance practices. Moreover, the sheer size of the payout to Ovitz, as alleged, pushes the envelope of judicial respect for the business judgment of directors in making compensation decisions. Therefore, both as to the processes of the two Boards and the waste test, this is a close case.

*Id.* Later in the decision, the high court observed that "[o]ne can understand why Disney stockholders would be upset with such an extraordinarily lucrative compensation agreement and termination payout awarded a company president who served for only a little over a year and who underperformed to the extent alleged." *Id.* at 267.

35

After affirming the dismissal of the complaint as framed, the Delaware Supreme Court noted that the plaintiffs "may well have the 'tools at hand' to develop the necessary facts for pleading purposes," including using Section 220. *Id.* at 266. Citing the "unusual nature of this case," the senior tribunal reversed the dismissal "only to the extent that the dismissal ordered by the Court of Chancery was with prejudice." *Id.* at 267. The without-prejudice dismissal would "permit plaintiffs to file an amended complaint in accordance with the rulings of this Court as set forth in this opinion." *Id.* The high court noted that it did not "presume to direct the Court of Chancery how it should decide any proceeding under Section 220" but that "[f]rom a timing perspective . . . such a proceeding is a summary one that should be managed expeditiously." *Id.*

The plaintiffs took the hint. They used Section 220, obtained books and records, and filed an amended complaint. This time, the claims survived a motion to dismiss for failure to plead that demand was futile. *In re Walt Disney Co. Deriv. Litig. (Disney III)*, 825 A.2d 275 (Del. Ch. 2003). The Chancellor helpfully summarized his reasoning:

> Stated briefly, plaintiffs' new allegations give rise to a cognizable question whether the defendant directors of the Walt Disney Company should be held personally liable to the corporation for a knowing or intentional lack of due care in the directors' decision-making process regarding Ovitz's employment and termination. It is rare when a court imposes liability on directors of a corporation for breach of the duty of care, and this Court is hesitant to second-guess the business judgment of a disinterested and independent board of directors. But the facts alleged in the new complaint do not implicate merely negligent or grossly negligent decision making by corporate directors. Quite the contrary; plaintiffs' new complaint suggests that the Disney directors failed to exercise *any* business judgment and failed to make *any* good faith attempt to fulfill their fiduciary duties to Disney and its stockholders. Allegations that Disney's directors abdicated all responsibility to consider appropriately an action of material importance to the corporation puts directly in question whether the board's decision-

36

making processes were employed in a good faith effort to advance corporate interests. In short, the new complaint alleges facts implying that the Disney directors failed to act in good faith and meet minimal proceduralist standards of attention. Based on the facts asserted in the new complaint, therefore, I believe plaintiffs have stated cognizable claims for which demand is excused and on which a more complete factual record is necessary.

*Id.* at 278 (quotation marks and footnote omitted).

Eventually, after a full trial, the defendants prevailed on the merits. *In re Walt Disney Co. Deriv. Litig. (Disney IV)*, 907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006). Because the *Disney* saga went the distance, we came to know the facts as developed after extensive discovery and as analyzed by the court. Those facts differed materially from the pleading-stage allegations and the reasonable inferences they supported.

From my standpoint, both factually and legally, the current showing regarding the events at Yahoo falls somewhere between *Disney I* and *Disney III*. Amalgamated has collected publicly available materials and received some information from Yahoo. The resulting record is troubling and fails to answer important questions about the conduct of Mayer, the Committee, and the Board in both the hiring and firing of de Castro. I need not and do not hold that the record developed to date establishes wrongdoing, nor even that it supports a claim for wrongdoing. It does, in my view, provide a "credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation." *Seinfeld*, 909 A.2d at 123. To state what should be obvious, the existence of a credible basis to suspect possible wrongdoing sufficient to warrant further investigation does not mean that wrongdoing actually occurred. Even in

*Disney*, where the complaint survived a motion to dismiss, the defendants ultimately prevailed.

One basis for potential wrongdoing is a possible breach of fiduciary duty. For analytical clarity, this decision first discusses de Castro's hiring, then turns to his firing. That separation is artificial, because the two decisions are factually and legally interrelated. Taken together, they are more troubling than either individually.

### i. Possible Breaches In The Hiring Process

There is a credible basis to suspect possible breaches of fiduciary duty by Mayer during the hiring process. Officers are corporate fiduciaries who owe the same fiduciary duties to the corporation and its stockholders as directors. *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009). Officers also are agents who report to the board of directors in its capacity as the governing body for the corporation.[24] "The General Corporation Law

---

[24] *See* 8 *Del. C.* § 141(a). A vibrant debate exists over the extent to which the full agency law regime should apply to officers. One of the principal disputes appears to be whether officers should be liable for simple negligence, like agents generally, or whether some form of more deferential standard of review, such as the business judgment rule, should apply to their decisions. This opinion does not speculate on that issue. For examples of the debate over the standard of review, see Lyman Johnson & Robert Ricca, *Reality Check on Officer Liability*, 67 Bus. Law. 75 (2011); Paul Graf, *A Realistic Approach to Officer Liability*, 66 Bus. Law. 315 (2011); Lyman P.Q. Johnson & David Millon, *Recalling Why Corporate Officers are Fiduciaries*, 46 Wm. & Mary L. Rev. 1597 (2005); Lawrence A. Hamermesh & A. Gilchrist Sparks III, *Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson*, 60 Bus. Law. 865 (2005); Lyman P.Q. Johnson, *Corporate Officers and the Business Judgment Rule*, 60 Bus. Law. 439 (2005); A. Gilchrist Sparks, III & Lawrence A. Hamermesh, *Common Law Duties of Non-Director Corporate Officers*, 48 Bus. Law. 215 (1992). For examples of scholarly analyses addressing other aspects of the officer's role as corporate agent, see Megan W. Shaner, *The (Un)Enforcement of Corporate Officers' Duties*, 48 U.C. Davis L. Rev. 271 (2014); Amitai Aviram, *Officers' Fiduciary Duties and the Nature of Corporate Organs*, 2013 U. Ill. L. Rev. 763; Megan W. Shaner, *Restoring the Balance of Power in Corporate*

of the State of Delaware . . . and the decisions of [the Delaware Supreme] Court have

repeatedly recognized the fundamental principle that the management of the business and

affairs of a Delaware corporation is entrusted to its directors, who are the duly elected

and authorized representatives of the stockholders."[25] Within this relationship, officers

have a duty to comply with the board's directives. *See* Restatement (Third) of Agency §

8.09 (2006). Stated in the negative, "[a] chief executive officer . . . may not act in a

manner contrary to the express desires of the board of directors." *Disney IV*, 907 A.2d at

775 n.570. Officers also have a duty to provide the board of directors with the

information that the directors need to perform their statutory and fiduciary roles.[26]

---

*Management: Enforcing an Officer's Duty of Obedience*, 66 Bus. Law. 27 (2010); Donald C. Langevoort, *Agency Law Inside the Corporation: Problems of Candor and Knowledge*, 71 U. Cin. L. Rev. 1187 (2003).

[25] *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 41-42 (Del. 1994); *see, e.g.*, *McMullin v. Beran*, 765 A.2d 910, 916 (Del. 2000) ("One of the fundamental principles of the Delaware General Corporation Law statute is that the business affairs of a corporation are managed by or under the direction of its board of directors."); *Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281, 1291-92 (Del. 1998) ("One of the most basic tenets of Delaware corporate law is that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation . . . . Section 141(a) . . . confers upon any newly elected board of directors *full* power to manage and direct the business and affairs of a Delaware corporation."); *Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1154 (Del. 1989) ("Delaware law confers the management of the corporate enterprise to the stockholders' duly elected board representatives.").

[26] *See* Restatement (Third) of Agency § 8.11 (describing agent's duty to provide principal with facts that the agent knows); *see also Kalisman v. Friedman*, 2013 WL 1668205, at *4 (Del. Ch. Apr. 17, 2013) (discussing director information rights); *Lewis v. Vogelstein*, 699 A.2d 327, 334 (Del. Ch. 1997) (Allen, C.) ("[S]ince the relationship between a principal and agent is fiduciary in character, the agent . . . must act not only with candor, but with loyalty."); *cf. Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *34 (Del. Ch. July 12, 2010) (Strine, V.C.) ("[W]hen a corporate officer is aware of financial misreporting that involves high-level management and that has evaded the corporation's auditors, and nonetheless certifies that he is

There is a credible basis to suspect that Mayer failed to provide material information to the Committee during the early stages of the hiring process, when she cryptically withheld de Castro's name, position, and qualifications while seeking the Committee's blessing for a large compensation package that the Committee's compensation consultant regarded as "generally more than the data supported." JX5 at 2. More seriously, there is a credible basis to suspect that Mayer provided inaccurate information to the Committee about the terms of the Original Offer Letter when asking them to approve a change to de Castro's package, and that the Committee agreed to the change based on the inaccurate information that Mayer provided. The changes effectively doubled the payout on the Incentive RSUs and Options.

It may be that Mayer's conduct did not constitute a breach of fiduciary duty, but it is worthy of investigation. Based on the current record, it is not clear why Mayer did these things, and a range of explanations are possible. She may have made an innocent mistake, and if this case ever proceeds on the merits, it might be shown to be inconsequential. She may have been negligent to some degree. Although it seems

---

not aware of any material weakness in the company's internal controls, he is making a false statement and failing to bring material information to the board, in breach of his duty of loyalty."); *Ryan v. Gifford*, 935 A.2d 258, 272 (Del. Ch. 2007) (holding that complaint stated claim for breach of the duty of loyalty against CFO and vice president who knew about backdating but "kept silent"); *Hoover Indus., Inc. v. Chase*, 1988 WL 73758, at *2 (Del. Ch. July 13, 1988) (Allen, C.) ("A director does breach his duty of loyalty if he knows the company has been defrauded and does not report what he knows to the board or to an appropriate committee of the board, at the very least when he is involved in the fraud and keeps silent in order to escape detection."). *See generally* Langevoort, *supra*, at 1191-1208 (discussing duty of candor for officers under agency principles and corporate law).

unlikely, perhaps she had some improper motive. Amalgamated observes that just as Eisner was negotiating with his friend Ovitz in the *Disney* case, Mayer was negotiating with a colleague from her former employer. At this stage, I am not suggesting, nor inferring, that Mayer intentionally hid information or lied to the Committee. This decision determines only that there is a credible basis for further investigation.

The credible basis becomes stronger, in my view, because of the changes that Mayer made to the Final Offer Letter. The Committee approved the Original Offer Letter, signed off on the elimination of the Specified Percentage for the Incentive RSUs and Options, and reserved its authority to approve any material changes in de Castro's employment agreement. In preparing the Final Offer Letter, Mayer made additional changes to the terms of de Castro's employment that materially increased his potential compensation. Mayer does not appear to have informed the Committee about the changes, and they do not appear to have been authorized by the Committee. Again, based on the current record, it is not clear why Mayer did these things, and the explanation may well be innocent or innocuous. Regardless, further investigation is warranted.

Grounds also exist for investigation into the roles played by the Yahoo directors. At the pleading stage in *Disney III*, Chancellor Chandler held that the directors' lack of involvement in Ovitz' hiring stated a claim for bad faith conduct. There, as here, the corporation's CEO conducted the negotiations. When Eisner eventually briefed Disney's compensation committee, Eisner did not give the directors all of the information he had, only a rough and incomplete summary of the terms of the offer he had made. The committee members also did not receive any "analytical document showing the potential

41

payout to Ovitz throughout the contract, or the possible cost of his severance package upon a non-fault termination." 825 A.2d at 280 (formatting omitted). After a short meeting, the compensation committee approved the offer and gave Eisner the authority to finalize the contract if the terms fell within the framework of the summary. The full Disney board then met and appointed Ovitz to the office of President. Two months later, the final employment agreement was executed in a form that "differed significantly" from the terms that the compensation committee had reviewed. *Id.* at 282. When considered together with the allegations regarding Ovitz's subsequent no-fault termination, the Chancellor held that these allegations supported an inference that the directors had acted in an "ostrich-like" manner that fell outside the protection of the business judgment rule. *Id.* at 288. That behavior in turn "suggest[ed] that the defendant directors *consciously and intentionally disregarded their responsibilities*, adopting a 'we don't care about the risks' attitude concerning a material corporate decision." *Id.* at 289. As pled, that supported an inference of bad faith conduct: the "defendant directors *knew* that they were making material decisions without adequate information and without adequate deliberation, and . . . they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." *Id.*

Based on the current record, the Yahoo directors were more involved in the hiring than the Disney directors were, but the facts still bear a close resemblance to the allegations in *Disney III*. The directors' involvement appears to have been tangential and episodic, and they seem to have accepted Mayer's statements uncritically. A board cannot mindlessly swallow information, particularly in the area of executive compensation:

42

"While there may be instances in which a board may act with deference to corporate officers' judgments, executive compensation is not one of those instances. The board must exercise its own business judgment in approving an executive compensation transaction." *Haywood v. Ambase Corp.*, 2005 WL 2130614, at *6 (Del. Ch. Aug. 22, 2005). Directors who choose not to ask questions take the risk that they may have to provide explanations later, or at least produce explanatory books and records as part of a Section 220 investigation.

This decision does not hold that the Yahoo directors breached their duties. It holds only that compared with the bookends of *Disney I* and *Disney III*, there is a credible basis to investigate possible claims of breach of duty by the Committee and the Board.

### ii. Possible Breaches In The Firing Process

The same is true for de Castro's firing, where there is a credible basis to suspect the possibility of wrongdoing by Mayer, the Committee, and the Board. The issue at this stage turns on why Yahoo's fiduciaries agreed to a without-cause termination when a for-cause alternative was potentially available. The same issue troubled the court in *Disney III*. *See* 825 A.2d at 287-88. Mayer decided initially to terminate de Castro and characterize it as "without cause." Despite the financial implications, the Committee did not question Mayer's decision. They do not appear to have asked any questions at all. Instead, they rubberstamped what Mayer had done through a quick email exchange of written consents. The directors did not engage until three weeks later, when the Committee determined to what degree Yahoo had met the performance criteria for option vesting. The Committee did not receive a report about the reasons for de Castro's

43

termination until three weeks after that, when they decided not to award de Castro a bonus under the Executive Incentive Plan. As in *Disney III*, this suggests ostrich-like conduct warranting further investigation.

### b. Possible Waste

In addition to a credible basis to suspect wrongdoing involving potential breaches of fiduciary duty, there is also reason to suspect waste. "Corporate waste occurs when a corporation is caused to effect a transaction on terms that no person of ordinary, sound business judgment could conclude represent a fair exchange." *Steiner v. Meyerson*, 1995 WL 441999, at *1 (Del. Ch. July 19, 1995) (Allen, C.).

> This is obviously an extreme test, very rarely satisfied by a shareholder plaintiff. The difficulty of this test does not reflect judicial laxity or sympathy, but rather reflects the law's understanding of what rules will help promote wealth creating activity. If courts were permitted more freely to "second guess" the terms of corporate contracts (on for example a "reasonableness" ground) there would be a substantial disincentive created for officers and directors (especially directors who generally receive no incentive compensation) to approve risky transactions. Yet the corporate form, with its limited liability and potential for investor diversification, has great utility in part because these characteristics encourage the assumption of economic risk. The very high hurdle that a shareholder must overcome if he seeks to impose liability on a theory of corporate waste is, thus, in fact a protection of one of the basic utilities that the corporate form offers.

*Id.*

Despite the difficult standard for waste, Delaware courts have permitted complaints challenging senior executive compensation as waste to survive the pleading stage. For example, Chancellor Chandler held that a stockholder plaintiff had stated a claim for waste involving a $68 million compensation package for the outgoing CEO of Citigroup, Inc., Charles Prince, "whose failures as CEO were allegedly responsible . . .

for billions of dollars of losses at Citigroup." *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 138 (Del. Ch. 2009). The court explained that although directors have discretion when setting executive compensation, "there is an outer limit" to that discretion, "at which point a decision of the directors on executive compensation is so disproportionately large as to be unconscionable and constitute waste." *Id.* (quoting *Disney II*, 746 A.2d at 262-63 & n.56). Chancellor Chandler credited the allegation that Prince's $68 million severance package was "so one sided" that it met the "admittedly stringent" waste standard. *Id.* at 138-39.

The question for present purposes is whether there is reason to believe that waste may have occurred. There is reason to believe that by making changes to the Final Offer Letter, Mayer increased de Castro's compensation unilaterally, without Committee or Board approval, suggesting waste. There is also reason to believe that de Castro could have been fired for cause, thereby avoiding the payment of any severance. Instead, Mayer decided that the termination would be without cause, and the Committee members went along. On the facts presented, Amalgamated has established a basis for further investigation.

## 2. Exploring Director Disinterestedness And Independence

Another purpose for using Section 220 is to investigate questions of director disinterestedness and independence.[27] The Delaware Supreme Court has observed that it

---

[27] *See Rock Solid Gelt Ltd. v. SmartPill Corp.*, 2012 WL 4841602, at *4 (Del. Ch. Oct. 10, 2012); *La. Mun. Police Empls. Ret. Sys. v. Morgan Stanley & Co. Inc.*, 2011 WL 773316, at

is "within [a stockholder's] power to explore these matters" using Section 220. *Beam* ex rel. *Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1056 (Del. 2004). The high court observed that appropriate areas for inspection for this purpose could include the company's "process of nominating board members," the degree of management involvement in or influence over the nomination process, and "whether the process incorporated procedural safeguards to ensure directors' independence." *Id.* The high court also posited that a stockholder might use Section 220 to review minutes showing how "the directors handled [management] proposals or conduct in various contexts," which could reveal patterns of behavior.[28]

More recently, the Delaware Supreme Court has indicated that a plaintiff could obtain "a file of the disclosure questionnaires for the board" or similar materials that could "provide more detail about the thickness of the relationship[s]" in the boardroom. *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1024 (Del. 2015). At the same time, the Delaware Supreme Court candidly observed that Section 220 likely has "limited utility" for purposes of uncovering this type of information.[29]

---

*7 (Del. Ch. Mar. 4, 2011); *Haywood v. Ambase Corp.*, 2005 WL 2130614, at *6 (Del. Ch. Aug. 22, 2005); *Amalgamated Bank v. UICI*, 2005 WL 1377432, at *3 (Del. Ch. June 2, 2005); *Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 566 (Del. Ch. 1998).

[28] *Id.*; *see also Grimes v. Donald*, 673 A.2d 1207, 1216 n.11 (Del. 1996) (noting that Section 220 may be used to obtain information to support arguments regarding demand futility); *Rales v. Blasband*, 634 A.2d 927, 934 n.10 (Del. 1993) (same).

[29] *Id.*; *accord Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 889 n.32 (Del. Ch. 1999) (Strine, V.C.) (noting that there were limits to the extent to which a plaintiff could use books and records to explore a relationship between a director and an interested party before filing and that

In this case, Amalgamated identified a proper purpose in seeking to obtain books and records for the purpose of investigating questions of director disinterestedness and independence.

### 3. Exculpation As A Means Of Cutting Off Otherwise Proper Purposes

In a recent decision, this court held that a stockholder who sought books and records for the purpose of bringing a derivative action for breach of fiduciary duty lacked a proper purpose for conducting an inspection where the corporation had an exculpatory provision and the stockholder had not identified a credible basis for believing that that the directors had engaged in non-exculpated conduct. *Se. Pa. Transp. Auth. v. Abbvie, Inc.*, 2015 WL 1753033, at *14 (Del. Ch. Apr. 15, 2015), *aff'd*, 2016 WL 235217 (Del. Jan. 20, 2016) (ORDER). Yahoo has an exculpatory provision. Relying on *Abbvie*, Yahoo argues that Amalgamated lacks a proper purpose and that the inspection should be denied.

The *Abbvie* decision and this case are distinguishable on their facts. First, the evidence of possible wrongdoing in *Abbvie* was flimsy at best: the directors had agreed to pay a termination fee to an acquirer if an inversion transaction failed to go through. 2015 WL 1753033, at *14. The potential for regulatory problems was a known risk, the parties

---

"one wonders how a plaintiff could use tools such as 8 *Del. C.* § 220 or public filings to generate such facts"); J. Travis Laster & K. Tyler O'Connell, *Directors' Social and Business Relationships in the Pre-Suit Demand Contest*, 8 No. 1 M & A Law. 20 (May 2004) ("The [*Beam*] Court reiterated its often-repeated suggestion that stockholder plaintiffs inspect corporate books and records before filing, however, this admonition rings somewhat hollow in this case. Would-be plaintiffs might reasonably ask, exactly what proof of exceedingly close friendship among directors are they likely to find?").

to the transaction bargained over it, and the board approved a merger agreement that provided for the termination fee. *Id.* at \*14-15. The grounds for concern regarding the hiring and firing of de Castro are much stronger.

Second, the *Abbvie* decision noted that there were a variety of purposes for which a stockholder could use books and records, but concluded "from the Plaintiffs' statements at oral argument . . . that both Plaintiffs seek an investigation to aid in future derivative litigation" and that "litigation is the sole motivation for the Plaintiffs' investigations." 2015 WL 1753033, at \*12. Amalgamated has not similarly limited its potential uses of the fruits of its investigation. The Delaware Supreme Court has stated that

> [s]tockholders may use information about corporate mismanagement, waste or wrongdoing in several ways. For example, they may institute derivative litigation; seek an audience with the board of directors to discuss proposed reform or, failing in that, they may prepare a stockholder resolution for the next annual meeting, or mount a proxy fight to elect directors.

*Seinfeld*, 909 A.2d at 119-20 (quotation marks and alterations omitted); *accord Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 117 (Del. 2002). Exculpation is not an impediment to the potential use of information obtained pursuant to Section 220 for taking action other than filing a lawsuit.

Third, given the meager showing of potential wrongdoing by the plaintiffs in *Abbvie*, the court understandably concluded that there was no basis to suspect the possibility of misconduct that might support a non-exculpated claim. That is not the case here. The claim that survived a motion to dismiss in *Disney III* was that the directors had

48

not acted in good faith, which is an aspect of the duty of loyalty and hence not subject to exculpation.[30] The waste claim also could fall outside the exculpatory provision. Waste traditionally has been viewed as a separate cause of action, but it also can be understood as a means of proving bad faith conduct. *See Sample v. Morgan*, 914 A.2d 647, 670 (Del. Ch. 2007) (Strine, V.C.) (characterizing waste as a transaction "so one-sided as to create an inference that no person *acting in a good faith pursuit* of the corporation's interests could have approved the terms" (emphasis added)).

I have doubts that Amalgamated will be able to pursue and prevail on a non-exculpated claim against Yahoo's outside directors. My skepticism rests on a combination of confidence in what the record will show about the directors' oversight, knowledge of the significant protections disinterested and independent directors enjoy, and familiarity with the difficulties involved in litigation. The question now, however, is not whether Amalgamated will prevail. Nor is the question even whether it is reasonably conceivable that Amalgamated could prevail. The inquiry is whether Amalgamated has established a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation. *Seinfeld*, 909 A.2d at 123. On

---

[30] *See* 8 *Del. C.* § 102(b)(7)(ii) (excluding "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law"); *Disney III*, 825 A.2d at 290 ("[P]laintiffs' allegations support claims that fall *outside* the liability waiver provided under Disney's certificate of incorporation."); *see also Stone* ex rel. *AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006) ("The failure to act in good faith may result in liability because the requirement to act in good faith is a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty." (quotation marks and alterations omitted)).

the facts, I do not believe that the potential for directors to rely on exculpation if and when a case is filed on the merits warrants foreclosing an inspection now.

There is also the possibility of a claim against Mayer in her capacity as an officer. Section 102(b)(7) does not authorize exculpation for officers.[31] In *Abbvie*, the court recognized this possibility but observed that the plaintiffs had "failed to meet their burden to show a credible basis from which the Court can infer any corporate wrongdoing on the part of AbbVie's non-exculpated officers." 2015 WL 1753033, at *13 n.108. In this case, there is evidence supporting potential misconduct by Mayer in her capacity as an officer, including when providing information to the Board, making changes to the Final Offer Letter, and deciding on a without-cause termination for de Castro. A suit solely against Mayer would face legal hurdles, but the exculpatory provision is not one of them. It would be premature on the facts presented to allow Yahoo to rely on its exculpatory provision to foreclose Amalgamated from investigating further.

## C.     The Scope Of The Inspection

Because Amalgamated has satisfied the prerequisites for conducting an inspection, this court's task is to determine its scope. "[I]t is the responsibility of the trial court to tailor the inspection to the stockholder's stated purpose." *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 569 (Del. 1997).

---

[31] 8 *Del. C.* § 102(b)(7) (authorizing "a provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director"); *Gantler v. Stephens*, 965 A.2d 695, 709 n.37 (Del. 2009) ("Although legislatively possible, there currently is no statutory provision authorizing comparable exculpation of corporate officers.").

"[T]he burden of proof is always on the party seeking inspection to establish that each category of the books and records requested is essential and sufficient to [the party's] stated purpose."[32] In Delaware decisions framing the standard, the adjective "necessary" sometimes replaces "essential."[33] Usually, however, Delaware cases use both,[34] thereby demonstrating fealty to "the law's hoary tradition of deploying joint terms, such as 'indemnify and hold harmless,' where technically one term would suffice."[35]

---

[32] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996); *accord Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 371 (Del. 2011) ("A shareholder . . . [must] show that the specific books and records he seeks to inspect are essential to the accomplishment of the stockholder's articulated purpose for the inspection." (quotation marks and alterations omitted)); *id.* at 367 ("We affirm . . . on the alternative ground that [the plaintiff] has not shown that the Covington Report is essential to his stated purpose."); *id.* at 371-72 (elaborating on what it means for a document to be "essential").

[33] *See, e.g.*, *Norfolk Cty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *5 (Del. Ch. Feb. 12, 2009) ("I must examine . . . the scope of the documents necessary and sufficient to address any proper purpose."); *Dobler v. Montgomery Cellular Hldg. Co.*, 2001 WL 1334182, at *7 n.28 (Del. Ch. Oct. 19, 2001) ("The Court is required to evaluate, under the circumstances, whether the sought after document is necessary for the proper purposes of the shareholders."). At least one decision uses another synonym, "required." *Carapico v. Phila. Stock Exch., Inc.*, 791 A.2d 787, 793 (Del. Ch. 2000) (describing the test as whether the requested documents are "reasonably required to satisfy the purpose of the demand").

[34] *See, e.g.*, *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1271 (Del. 2014) (noting that appellants did not dispute that the operative standard for a Section 220 action was whether the documents were "necessary and essential"); *Saito*, 806 A.2d at 116 ("The scope of a stockholder's inspection . . . is limited to those books and records that are necessary and essential to accomplish the stated, proper purpose."); *BBC Acq. Corp. v. Durr-Fillauer Med., Inc.*, 623 A.2d 85, 88 (Del. Ch. 1992) (stating standard as whether documents are "necessary, essential, and sufficient for the shareholders' purpose").

[35] *Quadrant Structured Prods. Co. v. Vertin*, 106 A.3d 992, 1024-25 (Del. 2013) (certifying question to New York Court of Appeals; attaching exhibit quoting trial court report provided in response to similar question posed by Delaware Supreme Court as part of its

Subtle connotations aside, the terms "necessary" and "essential" are functionally synonymous for purposes of Section 220. *Sanders v. Ohmite Hldgs., LLC*, 17 A.3d 1186, 1194 n.2 (Del. Ch. 2011). The plaintiff can obtain books and records that "address the 'crux of the shareholder's purpose' and if that information 'is unavailable from another source.'" *Wal-Mart*, 95 A.3d at 1271 (quoting *Espinoza*, 32 A.3d at 371-72).

To reinforce the foundation of indispensability (however framed), the operative standard trowels a layer of sufficiency ("essential and sufficient"). *Thomas & Betts*, 681 A.2d at 1035. The inspection should stop at the quantum of information that the court deems "sufficient" to accomplish the plaintiff's stated purpose. *Id.* If the books and records are not "essential" for the stockholder's purpose, then the stockholder already has "sufficient" information and the inspection can be denied as seeking materials beyond what is "needed to perform the task." *Carapico*, 791 A.2d at 793 (quoting *BBC Acq.*, 623 A.2d at 88). Stated conversely, if the stockholder already has "sufficient" information from other sources or as a result of other books and records requests, then the inspection

_____

remand), *certified question answered*, 16 N.E.3d 1165 (N.Y. 2014); *see Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 588 (Del. Ch. 2006) (Strine, V.C.) (declining to give separate meaning to the phrase "hold harmless"; noting that "[t]he terms 'indemnify' and 'hold harmless' have a long history of joint use throughout the lexicon of Anglo–American legal practice"). *See generally* Bryan A. Garner, The Redbook: A Manual on Legal Style § 11.2 at 224 (3d ed. 2013) ("The doublet and triplet phrasing common in Middle English still survives in legal writing, especially contracts, wills, and trusts. That's probably the worst possible soil for it to grow in because those who interpret legal writing are impelled to strain for distinctions so that no word is rendered surplusage. Yet that is exactly all but one word . . . is [in these phrases].").

can be curtailed because the additional materials are not "essential."[36] Whether documents meet the test is "fact specific and will necessarily depend on the context in which the shareholder's inspection demand arises." *Wal-Mart*, 95 A.3d at 1283 (quotation marks omitted).

### 1. Books and Records Related To De Castro's Hiring

The first request in the Demand seeks "[a]ll Yahoo books and records relating to Mr. de Castro's compensation (including salary, bonus, stock options, severance payments, RSUs, and all other compensation outlined in the [Final] Offer Letter)." JX 35 at 3. The first request defines this category as "including" ten subcategories:

(a)    any metrics utilized to set Mr. de Castro's compensation;

(b)    any comparison(s) of Mr. de Castro's compensation to the compensation of other past or present executive officers of Yahoo;

(c)    any comparison(s) of Mr. de Castro's compensation to the compensation of COOs or other executive officers at publicly-traded companies other than Yahoo;

(d)    minutes of any meetings involving any discussion of any compensation plan, including the 1995 Stock Plan (as defined in the [Final] Offer Letter), pursuant to which Mr. de Castro has received or will receive compensation;

---

[36] *See, e.g.*, *Marathon P'rs, L.P. v. M&F Worldwide Corp.*, 2004 WL 1728604, at *8 (Del. Ch. July 30, 2004) (denying inspection for valuation purposes because plaintiff "presented no evidence showing that the publicly available information is insufficient to value its publicly traded shares"); *Radwick Pty. Ltd. v. Med., Inc.*, 1984 WL 8264, at *3 (Del. Ch. Nov. 7, 1984) ("In deciding the extent of the stockholder's inspection rights, the Court should consider . . . the information previously provided by the company . . . ."); R. Franklin Balotti & Jesse A. Finkelstein, 1 *The Delaware Law of Corporations and Business Organizations* § 7.47, at 7-102.4 (3d ed. Supp. 2011) ("In determining whether to permit inspection (or the scope of any inspection), the court may examine the extent to which the corporation has previously furnished information (by public disclosure or otherwise) to stockholders.").

(e)     any policies and procedures applicable to the setting of Mr. de Castro's compensation, including any policies and procedures relating to the setting of compensation for executive officers of Yahoo;

(f)     any Board minutes and presentations relating to Mr. de Castro's compensation;

(g)     any Compensation Committee minutes and presentations relating to Mr. de Castro's compensation;

(h)     any expert's or consultant's reports or opinions concerning Mr. de Castro's compensation;

(i)     all drafts of the [Final] Offer Letter; and

(j)     documents reflecting the amounts and conditions of Mr. de Castro's post-employment payments or compensation.

*Id.* at 3-4.

If this case was a plenary action where the complaint had survived a motion to dismiss, and if the plaintiff had framed these demands as requests for production of documents pursuant to Rule 34, then Yahoo would be obligated to produce all responsive documents in its possession, custody, and control. *See* Ct. Ch. R. 34. If Yahoo wished to limit the scope of its production, the burden would lie with Yahoo to identify reasonable limitations and, if necessary, obtain an order from the court. *See* Ct. Ch. R. 26 (b)(1) & (c).

A Section 220 inspection, however, is not the equivalent of discovery in a plenary action. "The two procedures are not the same and should not be confused." *Sec. First*, 687 A.2d at 570. Unlike in plenary discovery, where the responding party bears the burden of limiting its scope, the burden in a Section 220 proceeding is on the party seeking production. *See Thomas & Betts*, 681 A.2d at 1035. Moreover, the court must

tailor the production order to balance the interests of the stockholder and the corporation.

*See Sec. First*, 687 A.2d at 569. As the Delaware Supreme Court has explained,

> [Section 220] does not open the door to the wide ranging discovery that would be available in support of litigation. For this statutory tool to be meaningful, however, . . . [a] stockholder who demands inspection . . . should be given access to all of the documents in the corporation's possession, custody or control, that are necessary to satisfy [that stockholder's] proper purpose. Thus, where a § 220 claim is based on alleged corporate wrongdoing, and assuming the allegation is meritorious, the stockholder should be given enough information to effectively address the problem, either through derivative litigation or through direct contact with the corporation's directors and/or stockholders.

*Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 114-15 (Del. 2002). "The source of the documents and the manner in which they were obtained by the corporation have little or no bearing on a stockholder's inspection rights. The issue is whether the documents are necessary and essential to satisfy the stockholder's proper purpose." *Id.* at 118.

The starting point—and often the ending point—for a sufficient inspection will be board level documents evidencing the directors' decisions and deliberations, as well as the materials that the directors received and considered.[37] A corporation usually can

---

[37] *See City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 1 A.3d 281, 291 (Del. 2010) (stating that "[board] accountability" for declining to accept the resignation of a director who did not receive support from a majority of a quorum "should take the form of being subject to a shareholder's Section 220 right to seek inspection of any documents and other records upon which the board relied"); *Cook v. Hewlett-Packard*, 2014 WL 311111, at *4 (Del. Ch. Jan. 30, 2014) (limiting inspection to "board-level" documents relating to an acquisition and subsequent problems with the acquired company); *Robotti & Co. v. Gulfport Energy Corp.*, 2007 WL 2019796, at *4 (Del. Ch. July 3, 2007) (permitting inspection of board minutes); *Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 567 (Del. Ch. 1998) (stating that "[t]he right to obtain corporate records for the purpose of determining whether or not a demand was improperly refused focuses on the committee process itself and extends at least to reports or minutes, reflecting the corporate action," including "copies of the Special Committee's report, minutes of

collect and provide these documents easily and quickly with minimal burden. In many organizations, the corporate secretary maintains a central file for each board meeting in either paper or electronic form. The file contains the minutes for the meeting and the materials that the directors received and reviewed.[38] These appear to be the types of documents that Yahoo referred to as the Board-Level Materials. A better nomenclature might be the "Formal Board Materials" or the "Official Board Materials," but this decision will use Yahoo's term.

In this case, the Board-Level Materials relating to de Castro's hiring were indisputably subject to inspection. These documents provided direct evidence of what the directors thought and did, and they were necessary for Amalgamated to investigate the hiring and the directors' disinterestedness and independence. Yahoo has represented that the Board-Level Materials have been provided. To the extent there are types of materials

the meetings of the Special Committee and minutes of any meeting of the board of directors relating to the creation or functioning of the Special Committee, including any meeting of the board of directors at which the recommendation of the Special Committee was considered or approved" (quotation marks and footnote omitted)).

[38] *See, e.g.*, 3 William B. Solomon & Michael A. Nemeroff, *Practice Checklist*, Successful Partnering Between Inside & Outside Counsel § 46A:31 (2015) ("In connection with the corporate secretary's role as the company's record keeper, the corporate secretary often maintains the official minutes of the meetings of the board in a central location. . . . The corporate secretary generally prepares board packages or gathers them from the applicable members of management, reviews what is gathered to ensure it is narrowly tailored to the board's purposes and disseminates the materials necessary for the board members to review in advance of each meeting of the board."); Soc'y of Corp. Sec'ys. & Gov'ce Prof'ls, Corporation Minutes: A Publication for the Corporate Secretary 23-24 (Feb. 2014) ("Corporate secretaries may also maintain separate meeting files for each board and committee meeting which includes the material related to the meeting and materials referenced in the minutes. . . . Companies have also started storing these materials electronically. . . .").

that did not appear in Yahoo's production, it is reasonably inferable that the directors did not receive or review them when hiring de Castro.[39]

Because Yahoo produced Board-Level Materials, the dispute in this case turns on whether and to what degree Yahoo must produce additional books and records relating to de Castro's hiring. Amalgamated seeks production of two additional categories. First, Amalgamated seeks Mayer's files, including emails[40] (the "Mayer Documents"). Second, Amalgamated seeks documents, including emails, that reflect "discussions or decisions of the full Board or Committee." Dkt. 25 at 33 (the "Additional Board Documents"). Documents in this category would include memos and notes about the subject matter of the Demand. It also would include emails to and from the directors from management or the compensation consultant, emails among the directors themselves, and documents and communications prepared by Yahoo officers and employees about the Board's deliberations.

### a. Mayer's Documents

---

[39] *See In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *20 (Del. Ch. May 21, 2013) (denying motion to dismiss pursuant to Rule 23.1; noting that the complaint supported its allegations "with references to books and records obtained using Section 220, and with inferences that this Court can reasonably draw from the *absence* of books and records that the Company could be expected to produce"); *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 578 (Del. Ch. 2007) (explaining that "it is more reasonable to infer that exculpatory documents would be provided [in response to a Section 220 demand] than to believe the opposite: that such documents existed and yet were inexplicably withheld").

[40] "The plural form of *e-mail* is. . . *e-mails*, even though there's no corresponding plural of *mail* as *mails*." Ben Zimmer, *The Plural of E-mail*, N.Y. Times (May 7, 2010), available at http://www.nytimes.com/2010/05/09/magazine/09FOB-onlanguage-t.html.

This court has the power to order production of documents prepared by officers and employees as part of a Section 220 inspection.[41] The question is whether the documents are essential to fulfilling the plaintiff's purpose.

The *Wal-Mart* case provides one example of a situation where this court found it necessary to order access to officer and employee level documents. The plaintiffs established a credible basis to suspect wide-ranging illegal conduct at a Wal-Mart subsidiary followed by an internal cover-up. *Wal-Mart*, 95 A.3d at 1267-68. Chief Justice Strine, then Chancellor, ordered an inspection of documents held by (i) eleven custodians, including senior officers and employees, (ii) the Chair of Wal-Mart's Audit Committee, and (iii) anyone who served as an assistant to those twelve individuals. *Id.* at 1269. The final order required Wal-Mart to produce "officer (and lower)-level documents regardless of whether they were ever provided to Wal-Mart's Board of Directors or any committee thereof." *Id.* at 1270.

On appeal, Wal-Mart challenged the order requiring production of officer and employee documents. The Delaware Supreme Court affirmed, explaining that because the stockholder sought to investigate misconduct involving officers, "officer-level documents are necessary and essential to determining whether and to what extent mismanagement occurred and what information was transmitted." *Id.* at 1273. The Delaware Supreme

---

[41] *See Wal-Mart*, 95 A.3d at 1273; *see also McKesson Corp. v. Saito*, 818 A.2d 970 (Del. 2003) (TABLE) (affirming Court of Chancery decision requiring production of officer level documents).

Court added that the officer-level documents "may establish director knowledge . . . by establishing that certain Wal-Mart offers were in a 'reporting relationship' to Wal-Mart directors, that those officers did in fact report to specific directors, and that those officers received key information." *Id.*; *see also Beam*, 845 A.2d at 1056 (explaining that officer-level documents also can be necessary to understand how "directors handled [management] proposals or conduct in various contexts," which could reveal patterns of boardroom behavior).

This case is not *Wal-Mart*, and in my view the facts of this case do not support the type of production that the Delaware Supreme Court approved there. To its credit, Amalgamated has not sought a similarly broad inspection. Amalgamated only seeks production of the Mayer Documents.

The evidence establishes that the Mayer Documents are necessary for a meaningful investigation of de Castro's hiring. The trial record establishes that Mayer was the principal corporate actor in the hiring process. She had all of the direct contact with de Castro and conducted all of the discussions. She negotiated all of the financial terms in the Original and Final Offer Letters. At present, she appears to be the person who modified the terms of the Final Offer Letter. Her documents, including notes and emails, will provide otherwise unavailable information about and insight into her discussions and negotiations. Those books and records will show what Mayer knew and when, and they will reveal any variations between what Mayer knew and what she told the Board.

The scope of the production of the Mayer Documents will include email and other electronic documents, which count as corporate books and records. Yahoo argues that electronic documents are beyond the scope of Section 220, because the statute does not mention "electronically stored information." Although it is true that Section 220 does not contain those words, Yahoo is wrong that inspection rights are limited to paper records.

Stockholder inspection rights in Delaware date from the turn of the twentieth century, when the courts recognized them under the common law. *See, e.g.*, *State* ex rel. *De Julvecourt v. Pan-Am. Co.*, 61 A. 398 (Del. Super. 1904), *aff'd*, 63 A. 1118 (Del. 1904). In that era and for a long time afterwards, courts logically focused on paper documents, but times have changed. "'Books' as we know them may cease to exist in the evolution of the Information Age." Francis G.X. Pileggi, Kevin F. Brady, & Jill Argo, *Inspecting Corporate 'Books and Records' in a Digital World: The Role of Electronically Stored Information*, 37 Del. J. Corp. L. 163, 165 (2012). Today, over 90% of business documents are stored electronically. *Id.* Limiting "books and records" to physical documents "could cause Section 220 to become obsolete or ineffective." *Id.* at 164.

In other areas, Delaware law has moved beyond defining corporate records as exclusively physical documents. Fifteen years ago, the General Assembly updated Section 224 of the DGCL to recognize that corporate books and records are stored in electronic form. The statute now states:

> Any records maintained by a corporation in the regular course of its business . . . may . . . be in the form of[] any information storage device . . . . When records are kept in such manner, a clearly legible paper form produced from or by means of the information storage device or

60

method shall be . . . accepted for all other purposes, to the same extent as an original paper record of the same information would have been . . . .

8 *Del. C.* § 224. Not surprisingly, Delaware precedents have ordered the production of electronic documents and emails in Section 220 actions.[42]

If Mayer chose to use a personal email account to conduct Yahoo business, she must produce responsive documents. "[R]ights of shareholders secured by § 220 cannot be defeated simply by having another entity hold the records." *Dobler*, 2001 WL 1334182, at *10. A corporate record retains its character regardless of the medium used to create it. By analogy, if two officers used their home computers to produce a confidential corporate document that they shared with one another over their private email addresses, no one would think that the report was a personal document that the officers could sell for their own profit. *See Ind. Elec. Workers Pension Tr. Fund IBEW v. Wal-Mart Stores, Inc.*, 7779-CS, at 97-98 (Del. Ch. May 20, 2013) (Strine, C.) (TRANSCRIPT) (using analogy to explain why Section 220 can extend to officers' and employees' personal email accounts when used for official business). As with other

_____

[42] *See, e.g.*, *Wal-Mart*, 95 A.3d at 1274 (affirming order requiring production of electronic documents, including data collected from disaster recovery tapes); *In re Lululemon Athletica Inc. 220 Litig.*, 2015 WL 1957196, at *6 (Del. Ch. Apr. 30, 2015) (explaining reasoning for ordering production of emails); *Tanyous v. Happy Child World, Inc.*, 2008 WL 2780357, at *7 n.50 (Del. Ch. July 17, 2008) (requiring production of "[c]orrespondence file with Citizens Bank including all e-mails, letters, reports, etc."); *Deephaven Risk Arb Trading, Ltd. v. UnitedGlobalCom, Inc.*, 2005 WL 1713067, at *10 (Del. Ch. July 13, 2005) (ordering production of "electronic communications"); *Dobler v. Montgomery Cellular Hldg. Co.*, 2001 WL 1334182, at *5-7 (Del. Ch. Oct. 19, 2001) (ordering production of emails "which reflect the decision making" of corporation's directors); *see also Khanna v. Covad Commc'ns Gp, Inc.*, 2004 WL 187274, at *9 (Del. Ch. Jan. 23, 2004) (considering production of emails in a Section 220 action but finding the request excessive given stated purpose).

categories of documents subject to production under Section 220, what matters is whether the record is essential and sufficient to satisfy the stockholder's proper purpose, not its source. *See Wal-Mart*, 95 A.3d at 1273.

## b.      Additional Board Documents

The Additional Board Documents are held by Yahoo officers and employees and by the directors themselves. Just as this court has the power to order production of corporate documents prepared by officers and employees as part of a Section 220 inspection, this court has the power to order production of corporate documents held by directors.[43] Once again, the question is whether the documents are essential to fulfilling the plaintiff's purpose.

The problem with the Additional Board Documents is the potential breadth of the category. It necessarily overlaps to some degree with the Mayer Documents, which Yahoo will provide. The discussion in this section therefore focuses on the Additional

---

[43] Through its jurisdiction over a corporation, a court can compel production of documents in the possession of officers, directors, and managing agents of the firm. *See In re Activision Blizzard, Inc.*, 86 A.3d 531, 552 (Del. Ch. 2014); *Hamilton P'rs, L.P. v. England*, 11 A.3d 1180, 1214 (Del. Ch. 2010); *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 1997 WL 716898, at *1 (Del. Super. Aug. 18, 1997) (ORDER); 7 Daniel R. Coquillette et al., *Moore's Federal Practice – Civil* § 30.03 (3d ed. 1997 & Supp. 2013); *see also Dalton v. Am. Inv. Co.*, 1981 WL 7619, at *1 (Del. Ch. June 9, 1981) (noting Court's discretionary authority to order a corporation to produce a particular officer, director, or managing agent for deposition in a particular location); *Lasher v. Sterwin Labs.*, 1980 WL 10017, at *1-2 (Del. Ch. Jan. 28, 1980) (ordering defendant corporations to produce witness for deposition in Delaware); 8A Charles Alan Wright et al., *Federal Practice and Procedure* § 2107 (3d ed. 1998 & Supp. 2010) ("A [third party] subpoena is not necessary if the person to be examined is a party or an officer, director, or a managing agent of the party" (footnote omitted)). The court can impose sanctions or other consequences on the firm if the officer, director, or managing agent fails to comply.

Board Documents relating to de Castro's hiring that are not already subject to production as Mayer Documents. But even with this limitation, the category of Additional Board Documents is still expansive and could encompass numerous document custodians. In addition to the directors themselves, possible custodians include Yahoo's compensation consultant, members of his team, and any other officers or employees who were involved in the hiring decision, such as personnel in Yahoo's human resources department. Possible documents would include anything memorializing or referring to the hiring decision and the directors' deliberations, including emails.

In my view, Amalgamated has not carried its burden to justify a production of this scope. Amalgamated would be entitled to that type of production in a plenary proceeding, but this is a Section 220 action.

A subset of the Additional Board Documents is justified. The production will be limited to Webb, James, Ligouri, and Wilson, who were the members of the Committee. Yahoo will produce their documents regarding de Castro's hiring, including their email communications.

### 2. Books And Records Relating To De Castro's Termination

The second and third requests in the Demand address de Castro's termination. Request 2 asks for "[a]ll books and records relating to Mr. de Castro's termination from Yahoo, including all Board and Compensation Committee minutes and presentations relating to Mr. de Castro's termination." JX 34 at 4. Request 3 asks for "[a]ny expert's or consultant's reports or opinions concerning Mr. de Castro's termination, including books and records sufficient to determine whether Mr. de Castro was terminated for 'Cause.'"

*Id.* Here again, Yahoo has produced the Board-Level Materials. The question is what else, if anything, needs to be produced.

Request 3 is easily dealt with. The trial record established that de Castro was not terminated for "Cause," so Amalgamated has its answer. Production of any expert's or consultant's report or opinions concerning de Castro's termination is necessary for Amalgamated's inspection, because these reports or opinions (if any) establish the informational base potentially available to Mayer and the Board. By limiting its production to Board-Level Materials, Yahoo may have excluded reports or opinions that Yahoo received below the Board level. The request as framed is narrow and targeted, and Yahoo will respond to it without limitation. If Yahoo's officers, or its human resources department, obtained a report or opinion from an expert or consultant about de Castro's termination, then that is something Yahoo should know and readily be able to provide.

Request 2 presents the same issues as Request 1, except that Request 2 addresses de Castro's firing while Request 1 involves the hiring. This decision's rulings on the Mayer Documents and the specified Additional Board Documents apply equally to Request 2, albeit with the subject matter modified. If anything, the case for producing the Mayer Documents and the specified Additional Board Documents is stronger for the termination, because it was Mayer who determined that de Castro had not performed his duties or fulfilled his responsibilities and decided to fire him. The Committee then approved the termination without deliberation or meaningful information, and the directors only became substantively involved after the fact.

### 3. Books And Records Relating To De Castro's Performance

The fourth request in the Demand seeks "[a]ll books and records relating to Mr. de Castro's job performance at Yahoo, including Board and Compensation Committee minutes relating to Mr. de Castro's performance as Chief Operating Officer." *Id.* Yahoo already has produced the Board-Level Materials. For the reasons already discussed, Yahoo also will produce the Mayer Documents and the specified Additional Board Documents.

The record provides reason to believe that there are additional books and records beyond the Board-Level Materials that are essential to Amalgamated's inspection. For example, Mayer told the Committee that she gave de Castro "feedback on the deficiencies in his performance." JX 36 at 7. It also seems likely that Mayer may have kept some or all of the directors informed about developments with de Castro outside of formal Board meetings. That seems particularly true for events in January 2014, where the official record of Committee involvement is decidedly sparse.

### 4. Board Appointments And Nominations

The fifth and final request in the Demand is "[a]ll books and records concerning discussions, communications, or decisions as to the nominations of the current members of the Company's Board, and the placement of such directors on any committees or subcommittees of the Company's Board." JX 35 at 4. Yahoo has not produced any documents responsive to this category.

The scope of the inspection called for by this request is potentially broad, but it is something that the Delaware Supreme Court contemplated in *Beam* and more recently in

*Wal-Mart* and *Sanchez.* I nevertheless believe the production should be tailored. In the first instance, the subject matter of the request is limited as follows:

- Rather than extending to "the nominations of the current members of the Company's Board," the request shall cover only the *initial* nominations of the current members of the Board.

- For purposes of the re-nomination of any existing member of the Board, the request shall apply *only to the extent that* there was consideration by the Board, the Nomination Committee, or Mayer about re-nominating a particular current member of the Board. Yahoo and its counsel should be able to determine relatively quickly by asking Mayer and the directors whether this has occurred. This should enable Yahoo to avoid a potentially broad search entirely or, if further investigation is necessarily, target the issue.

- The request about the placement of the directors on committees shall apply only to the directors who served on the Committee during the period that encompassed de Castro's hiring and firing.

Yahoo and its counsel should be able to determine whether and to what degree Yahoo keeps files on these matters. If Yahoo does not have a centralized file, then the custodians for purposes of production shall be Mayer, Yahoo's corporate secretary, Yahoo's head of human resources, and any officer or employee specifically tasked with director recruitment and evaluation, committee assignments, and board effectiveness. Yahoo also will produce any annual director questionnaires and related materials that the directors complete as part of Yahoo's preparation of its proxy or applications for directors' and officers' liability insurance. At present, Amalgamated has not convinced me that searching the outside directors' files and emails on this issue is warranted.

### 5. The Counsel Documents

A final issue that runs across all of the categories sought in the Demand is consultations with counsel ("Counsel Documents"). The Delaware Supreme Court has

66

held that if a stockholder has shown that particular documents are essential to its inspection, then the stockholder can overcome the attorney-client privilege and work product doctrine by making the showing required by *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970). *See Wal-Mart*, 95 A.3d at 1275-81. Before reaching the *Garner* analysis, however, the trial court first must determine that the documents are essential, because that inquiry "is dispositive of the threshold question—the scope of document production to which the plaintiff is entitled under Section 220." *Id.* at 1278; *accord Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 374 (Del. 2011).

At this point, I do not believe that Amalgamated has justified having Yahoo search broadly for Counsel Documents. To the extent that Yahoo previously identified any Counsel Documents during its collection of the Board-Level Documents, or if Yahoo identifies any when producing the Mayer Documents and the Additional Board Documents, then Yahoo will identify those documents on a privilege log. It is premature for this court to do anything other than require Yahoo to log documents.

**D.      The Incorporation Condition**

Yahoo raises one issue of first impression. Yahoo asks that this court condition any further production on Amalgamated incorporating by reference into any derivative action complaint that it files the full scope of the documents that Yahoo has produced or will produce in response to the Demand (the "Incorporation Condition"). Yahoo's request is granted, and further production is conditioned on Amalgamated agreeing that the entirety of Yahoo's production in response to the Demand is incorporated by reference in any derivative action complaint it files relating to the subject matter of the demand.

67

"Section 220(c) of the DGCL gives broad discretion to the Court of Chancery to condition a books and records inspection . . . ." *United Techs. Corp. v. Treppel*, 109 A.3d 553, 557-58 (Del. 2014). By statute, the Court of Chancery "may, in its discretion, prescribe any limitations or conditions with reference to the inspection, or award such other or further relief as the Court may deem just and proper." 8 *Del. C.* § 220(c).

"The ability to limit the use of information gathered from an inspection . . . has long been recognized as within the Court of Chancery's discretion." *United Techs.*, 109 A.3d at 558. This court has used conditions as part of its effort to "maintain a proper balance between the rights of shareholders to obtain information based upon credible allegations of corporation mismanagement and the rights of directors to manage the business of the corporation without undue interference from stockholders." *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 122 (Del. 2006).

One common limitation is to condition production on the stockholder entering into a confidentiality agreement. *See CM & M Gp., Inc. v. Carroll*, 453 A.2d 788, 793-94 (Del. 1982). Although once novel, now "[t]here is a presumption that the production of books and records pursuant to section 220 should be 'conditioned upon a reasonable confidentiality order.'" 1 Welch et al., *supra*, § 220.06, at 7-238.1 (quoting *Disney v. The Walt Disney Co.*, 857 A.2d 444, 447 (Del. Ch. 2004)). More recently, the Delaware Supreme Court held that this court can condition a Section 220 production on the plaintiff agreeing to file any subsequent derivative action in a Delaware court. *See United Techs.*, 109 A.3d at 558-59.

In this case, the Incorporation Condition protects the legitimate interests of both Yahoo and the judiciary by ensuring that any complaint that Amalgamated files will not be based on cherry-picked documents. It achieves this goal by building on the incorporation-by-reference doctrine, which permits a court to consider documents that have been incorporated by reference in a complaint when ruling on a motion to dismiss.[44] A plaintiff generally is master of its complaint and can choose what it wants to plead. "[A]ll well-pleaded factual allegations are accepted as true." *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896 (Del. 2002). The plaintiff also is entitled to "all reasonable inferences" that can be drawn from the allegations of the complaint. *Id.* at 897. If these principles were applied mindlessly, however, a plaintiff could describe a document or take a handful of words out of context and claim that the court was required to accept the plaintiff's pleading-stage characterization. Instead, under the incorporation-by-reference doctrine, "[a] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms." *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013).

The incorporation-by-reference doctrine permits a court to review the actual document to ensure that the plaintiff has not misrepresented its contents and that any

---

[44] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004); *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 658 n.3 (Del. Ch. 2013) (Strine, C.); *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 139 (Del. Ch. 2003).

inference the plaintiff seeks to have drawn is a reasonable one.[45] The doctrine limits the ability of the plaintiff to take language out of context, because the defendants can point the court to the entire document. The doctrine also enables courts to dispose of meritless complaints at the pleading stage. "Without the ability to consider the document at issue in its entirety, 'complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure.'" *General Motors*, 897 A.2d at 169-70 (quoting *Santa Fe*, 669 A.2d at 70). With the incorporation-by-reference doctrine, "a complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations." *Encorp*, 832 A.2d at 139. Likewise, "a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

The Incorporation Condition takes these concepts one step further by extending them to other documents that Yahoo produces in response to the Demand. If Yahoo feels that the plaintiff has seized on a document and taken it out of context, then the Incorporation Condition will permit Yahoo to point the court to the other documents. The Incorporation Condition also acknowledges that Yahoo has invested time litigating this

---

[45] *See In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169-70 (Del. 2006); *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995); *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 n.17 (Del. Ch. Feb. 21, 2014).

action and producing documents, "which comes at a cost to its stockholders." *United Techs.*, 109 A.3d at 560. Imposing the condition helps balance Yahoo's rights against those of the plaintiff by recognizing that the production as a whole should provide the basis for any follow-on complaint, not just a handful of isolated documents or emails.

It is important to stress what the Incorporation Condition does *not* do. The Incorporation Condition *does not change the pleading standard* that governs a motion to dismiss. For purposes of a Rule 12(b)(6) motion, "all well-pleaded factual allegations" still will be accepted as true. *Savor*, 812 A.2d at 896. If there are factual conflicts in the documents or the circumstances support competing interpretations, and if the plaintiff makes a well-pleaded factual allegation, then the allegation will be credited. The plaintiff also will be entitled to "all reasonable inferences." *Id.* at 897. This means that if a document or the circumstances support more than one possible inference, and if the inference that the plaintiff seeks is reasonable, then the plaintiff receives the inference. *Id.*

The same applies for a Rule 23.1 motion. All particularized factual allegations still will be accepted as true. *Rales v. Blasband*, 634 A.2d 927, 931 (Del. 1993). The court will "draw all inferences from those particularized facts in favor of the plaintiff, and not the defendant." *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1022 (Del. 2015). And when determining whether a plaintiff has pled facts supporting an inference that a director cannot act independently of an interested director for purposes of demand excusal, "all particularized facts pled by the plaintiffs about the relationships between the director and the interested party" will be considered "in their totality and not in isolation from each other." *Id. at* 1019.

71

In the end, the only effect of the Incorporation Condition will be to ensure that the plaintiff cannot seize on a document, take it out of context, and insist on an unreasonable inference that the court could not draw if it considered related documents. It will allow the court to address complaints that should not advance past the pleading stage, but it will not prevent a plaintiff from stating a well-pled claim. At a functional level, the Incorporation Condition resembles an approach that Delaware decisions have taken when ruling on motions to dismiss after plaintiffs have taken expedited discovery in support of preliminary injunction applications.[46] In the *Morton's* case, for example, then-Chancellor Strine denied an application for a preliminary injunction. Afterwards, the plaintiffs amended their complaint, and the defendants moved to dismiss the complaint for failing to state a cognizable claim. The plaintiffs had taken four depositions during the injunction phase, and the defendants attached the transcripts to their briefs. Chancellor Strine held that the plaintiffs had "plain[ly] reli[ed]" on "the discovery material taken in connection with their preliminary injunction application" when formulating their complaint, and he therefore treated the discovery material as incorporated by reference for purposes of his decision. *Morton's*, 74 A3d at 658 n.3. The Incorporation Condition accomplishes the

_____

[46] *See Gardner Denver*, 2014 WL 715705, at *8 (treating five depositions taken during expedited discovery as "integral" to the complaint for purposes of a motion to dismiss even though the plaintiffs had not cited all of them); *Morton's*, 74 A3d at 658 n.3; *see also Simplexity, LLC v. Zeinfeld*, 2013 WL 5702374, at *1 n.2 (Del. Ch. Oct. 17, 2013) (noting that although the court was only considering the documents explicitly incorporated by reference in the complaint, "the facts developed through expedited discovery only reinforce th[is] decision").

same result for the materials generated by the pre-suit investigation that Amalgamated is conducting using Section 220.

Amalgamated protests that the strictures of Rule 11 make the Incorporation Condition unnecessary. *See* Ct. Ch. R. 11. It is true, as Amalgamated argues, that Rule 11 mitigates the cherry-picking problem to some degree, but invoking Rule 11 is strong medicine. The more common case will involve a plaintiff's counsel seeking to draw an unreasonable inference by citing a document in isolation, not in bad faith but perhaps over-zealously in the belief that the document reveals more than it does. The Incorporation Condition enables a court to deal with that in more measured fashion.

A final procedural note: The Incorporation Condition does not mean that Amalgamated should attach the entire Section 220 production to a future complaint, nor is it an invitation for the defendants in a future action to file an appendix containing the entire Section 220 production in support of their motion to dismiss. Either approach would help the State of Delaware by generating hefty filing fees, but it would not help the parties brief the motion or the judge make a ruling. Amalgamated can and should file a complaint, if it chooses to do so, as if the Incorporation Condition had not been imposed. Defense counsel must then use judgment and supply the court only with the limited documents (if any) necessary to show that it would not be reasonable to draw a particular inference on which the complaint depends.

### III. CONCLUSION

Yahoo shall provide the additional books and records contemplated by this opinion, subject to the Incorporation Condition. The production shall be completed within thirty days. The parties shall submit a form of implementing order.