**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

PARAFLON INVESTMENTS, LTD.    )
    )
        Plaintiff,    )
    )
        v.    )    **C.A. No. 2017-0611-JRS**
    )
LINKABLE NETWORKS, INC.    )
    )
        Defendant.    )

**MEMORANDUM OPINION**

Date Submitted:  February 25, 2020
Date Decided:  April 3, 2020

Ryan W. Browning, Esquire of Manning Gross + Massenburg LLP, Wilmington, Delaware and Michael R. Perry, Esquire and Anna Baitchenko, Esquire of Hunton Andrews Kurth LLP, Boston, Massachusetts, Attorneys for Plaintiff.

Carl D. Neff, Esquire and Kasey H. DeSantis, Esquire of Fox Rothschild LLP, Wilmington, Delaware and Matthew C. Baltay, Esquire of Foley Hoag LLP, Boston, Massachusetts, Attorneys for Defendant.

**SLIGHTS, Vice Chancellor**

Plaintiff, Paraflon Investments, Ltd. ("Paraflon"), first invested in Defendant, Linkable Networks, Inc. ("Linkable" or the "Company"), in 2014, and made additional investments periodically thereafter. Linkable was never able to achieve profitability, however, and the Company was sold to the Collinson Group ("Collinson") in 2017 for pennies on the dollar. Linkable has no current business operations and only exists to manage its wind-down.

Apparently stunned by Linkable's implosion, Paraflon first requested books and records from the Company in May 2017, then made a formal demand for inspection under 8 *Del. C.* § 220 on August 11, 2017. It stated as its proper purpose a desire to investigate possible mismanagement and wrongdoing. Following an all-too-familiar script, the Company made some documents available, Paraflon demanded more, the Company demurred and Paraflon filed suit on August 24, 2017.[1] After reviewing the evidence presented at trial, I find Plaintiff is entitled to a small subset of additional documents beyond what has already been produced.

---

[1] Less familiar was Linkable's election to file a Motion to Dismiss the Section 220 Complaint under Rule 12(b)(6). A motion to dismiss a Section 220 complaint for failure to state a claim is, to put it mildly, *irregular. See Louisiana Mun. Police Emps. Ret. Sys. v. Morgan Stanley & Co., Inc.*, 2011 WL 773316, at *3 (Del. Ch. Mar. 4, 2011) (noting that this court discourages parties from bringing pleadings-based motions in summary proceedings, including Section 220 proceedings, because such motions tend to "promote delay" and undercut "the statutory mandate and policy that the proceeding be summary in character."). The Motion was summarily denied. *Paraflon Invs. Ltd. v. Linkable Networks, Inc.*, C.A. No. 2017-0611-JRS (Del. Ch. May 5, 2018) (TRANSCRIPT).

1

# I. BACKGROUND

I have drawn the facts from the evidence admitted at trial and those matters of which the Court may take judicial notice.[2] A trial on a paper record was held on January 28, 2020. The following facts were proven by a preponderance of the competent evidence.[3]

## A. The Parties and Relevant Nonparties

Plaintiff, Paraflon Investments, is a British Virgin Islands limited liability company.[4] It is owned and controlled by nonparty, Michael Sarkesian ("Sarkesian"), a sophisticated investor who resides in Switzerland.[5]

Defendant, Linkable Networks, is a Delaware corporation headquartered in Boston, Massachusetts.[6] Linkable was founded by nonparty, Thomas J. Burgess ("Burgess"), in 2010.[7] Before ceasing operations in 2017, Linkable's business was

---

[2] I cite to the trial arguments of counsel as "Tr. __", and the joint trial exhibits as "JX __." This Court may take judicial notice of facts "not subject to reasonable dispute . . ." DRE 201(b). There was a great deal of confusion among the parties in advance of trial regarding the scope of, and procedures for, the trial. D.I. 63; Tr. 7:13–10:12. This confusion, I think, has led to gaps in the trial record. *Id.*

[3] *Kosinski v. GGP, Inc.*, 214 A.3d 944, 950 (Del. Ch. 2019) (confirming a stockholder must prove by a preponderance of the evidence all the elements of a Section 220 claim).

[4] JX 43 ¶ 10.

[5] *Id.* at ¶¶ 10–11.

[6] *Id.* at ¶ 5.

[7] *Id.* at ¶ 3.

2

"to provide a scalable network connecting [credit] card holders to a national group of brands, retailers and restaurants."[8]

## B. Paraflon Invests in Linkable and the Company Performs Poorly

Paraflon first invested in Linkable in October 2014, eventually contributing over $7 million, making it one of the Company's largest investors.[9]  While Paraflon maintains it was misled by Burgess's extra-contractual promises that Linkable would swiftly achieve profitability, the evidence shows Paraflon was provided with offering documents that clearly explained Linkable was an early stage, unprofitable company with no guarantee of success.[10]  Over the following years, Linkable hemorrhaged cash, never approaching profitability.[11]  Sarkesian was kept abreast of these developments.[12]  Nevertheless, apparently optimistic that Linkable could turn things around, Sarkesian made an additional investment in the Company in November 2016.[13]

---

[8] *Id.* at ¶ 8.

[9] *Id.* at ¶ 9; JX 40 ¶ 2.

[10] *Compare* JX 40 ¶ 6 *with* JX 1 at 133.

[11] *See* JX 2 at 19; JX 4 at 5, 9; JX 5 at 5, 9; JX 12 at 7; JX 23 at 18; JX 27 at 17.

[12] JX 4 at 1; JX 5 at 1; JX 12 at 1; JX 23 at 1; JX 27 at 1.

[13] JX 21.

3

Paraflon's additional investment, however, was not sufficient to meet Linkable's voracious appetite for cash. In desperate need of an additional capital infusion, Linkable approached Blue Chip Venture Capital ("Blue Chip"), a Linkable investor, for funding in late 2016.[14] At the time of this contract, a Blue Chip affiliate, Mark Wright, sat on Linkable's board of directors (the "Board").[15] On November 8, 2016, Blue Chip signed a term sheet where it agreed to invest an additional $2.5 million in Linkable.[16] A few days later, however, Burgess alerted Sarkesian that Linkable would not be pursuing the Blue Chip funding.[17] Burgess accused Blue Chip of attempting to walk back on the term sheet by "play[ing] some very naughty games, [] restricting capital and [] now trying to pressure [Linkable] into ridiculous terms."[18] Sarkesian appeared to agree with Burgess's analysis.[19] Linkable ultimately declined to counter-sign the final Blue Chip investment

---

[14] JX 15.

[15] JX 26; JX 28.

[16] *Id.*

[17] JX 16 at 1–2.

[18] *Id.*

[19] *Id.*; JX 19.

agreement and never attempted to enforce the signed Blue Chip term sheet, even when the Company was on the verge of insolvency.[20]

## C. Sale of Linkable

On March 8, 2017, Sarkesian was informed at a meeting of the Board that the Company was on pace to run out of cash in two weeks.[21] On May 1, 2017, Burgess sent a memorandum to Sarkesian again stating that the Company was in critical condition.[22] The memo laid out three options for Linkable: (1) raise additional money on short notice; (2) a sale to nonparty Peerlogix as part of a three-company roll-up; or (3) a direct sale to a strategic buyer.[23] While Linkable's management initially recommended the sale to Peerlogix, they eventually decided against that transaction, and Linkable pursued a sale to a single strategic buyer.[24]

On June 12, Burgess notified Sarkesian that Linkable had terminated all of its employees and was focused exclusively on a sale.[25] That sales process eventually

---

[20] JX 30.  Linkable officially rejected Blue Chip's financing offer at its November 17, 2016 Board meeting.  JX 20 at 5.

[21] JX 27 at 17.

[22] JX 30.

[23] *Id.* at 2.

[24] *Id.*; JX 32.

[25] JX 32.

5

resulted in the Company signing an asset purchase agreement with Collinson, and Burgess notified Paraflon of the transaction on August 22, 2017.[26]

Under the terms of the sale, Collinson was to make an upfront payment of $950,000 with a two-year earn-out payment of up to $10 million.[27] Linkable co-founder and Board member, Francis Correra, accepted a short-term consulting job with Collinson as part of the transaction.[28] Given the capital structure and obligations of the Company, and the fact that Burgess agreed to defer any repayment for money he loaned to the Company, Burgess was unlikely to receive any consideration in the sale.[29] A majority of Linkable's stockholders approved the transaction, and it closed on September 1, 2017.[30]

### D. Procedural History

Paraflon sent its demand letter to Linkable on August 11, 2017, and filed its Complaint on August 24, 2017.[31] The Demand states as its purpose a desire to

---

[26] JX 39.

[27] JX 36.

[28] JX 37.

[29] *Id.*

[30] JX 43 ¶ 34.

[31] D.I. 1, Ex. 1 (the "Demand"); JX 40.

investigate potential mismanagement or wrongdoing at Linkable.[32] The Demand requests: (1) all financial records of the company; (2) any documents concerning the Collinson transaction, including electronic documents; (3) any documents concerning other potential buyers of the Company, including Peerlogix; (4) Board minutes, including electronic documents, going back to 2014; and (5) all documents surrounding the abandoned Blue Chip transaction, including any role Wright played in it.[33]

Linkable made a substantial voluntary production, but Paraflon sought more and filed its Complaint soon after.[34] After the Court denied Linkable's motion to dismiss, the Company made an additional document production in an effort to resolve the litigation. But Paraflon pressed on. In its pretrial briefing, Paraflon focused on four document requests it claims remain unaddressed: (1) documents surrounding the abandoned Blue Chip financing; (2) documents relating to the Collinson transaction; (3) certain of Linkable's financial records not produced; and (4) copies of consumer contracts Linkable apparently represented to Sarkesian it had

---

[32] Demand at 5.

[33] *Id.* at 2–4. The Demand also included other requests for documents that Plaintiff now admits are moot. Tr. 65:3–4.

[34] JX 40.

entered into with major retailers.[35]  The request for consumer contracts was not included in Plaintiff's Demand.  The case was submitted for decision on February 25, 2020.

## II.  ARGUMENT

A stockholder of a Delaware corporation is entitled to inspect that corporation's books and records for any "proper purpose" reasonably related to the stockholder's "interest as a stockholder."[36]  A desire to investigate mismanagement or wrongdoing is recognized as a proper purpose.[37]  When such is the stockholder's stated purpose, he must demonstrate "a credible basis from which a court can infer that mismanagement or wrongdoing may have occurred."[38]  The credible basis standard is the lowest burden of proof in our law, requiring that a plaintiff only present "some evidence" of wrongdoing "through documents, logic, testimony or

---

[35] Pl.'s Revised Reply Pretrial Br. ("RB") 6–12.  At trial, Defendant's counsel made clear that Linkable had provided "all of its financial statements," and that it had no audited financials or other unproduced financial statements.  Tr. 44:19–46:18.  Finding this representation credible, I deem that request now satisfied.

[36] 8 *Del. C.* § 220(b) ("A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder.").  Linkable does not dispute Plaintiff is a stockholder or that it has satisfied Section 220's "form and manner requirements."  *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 775–76 (Del. Ch. 2016) (discussing "form and manner" requirements).

[37] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006) ("It is well established that a stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.'")

[38] *Id.* at 118.

otherwise[.]"[39]  Where, as here, the corporation's charter contains an exculpatory provision under 8 *Del. C.* § 102(b)(7), the stockholder's purpose must target non-exculpated wrongdoing.[40]

If a plaintiff has stated a proper purpose, he must next show that each category of documents sought is "necessary, essential, and sufficient for the shareholders' purpose."[41]  "[The Court of Chancery] has wide latitude in determining the proper scope of inspection . . . ."[42]

**A. The Abandoned Blue Chip Funding**

According to Plaintiff, the fact that Linkable declined to enforce its term sheet with Blue Chip provides a credible basis to suspect wrongdoing.[43]  It argues that abandoning this financing at a time when the Company was in dire financial condition is inexplicable and cannot be attributed to the exercise of business judgment.  It offers, as one plausible explanation, that Linkable declined to pursue

---

[39] *Kosinski*, 214 A.3d at 953; *see Seinfeld*, 909 A.2d at 123 ("Although the threshold for a stockholder in a section 220 proceeding is not insubstantial, the 'credible basis' standard sets the lowest possible burden of proof.").

[40] *See Southeastern Pa. Trans. Auth. v. AbbVie, Inc.*, 2015 WL 1753033, at *13 (Del. Ch. Apr. 15, 2015), *aff'd*, 132 A.3d 1 (Del. 2016) ("[A] stockholder . . . has stated a proper purpose only insofar as the investigation targets non-exculpated corporate wrongdoing.").

[41] *BBC Acquisition Corp. v. Durr-Fillauer Med. Inc.*, 623 A.2d 85, 88 (Del. Ch. 1992).

[42] *Sec. First Corp. v. U.S. Die Casting and Dev. Co.*, 687 A.2d 563, 569 (Del. 1997).

[43] Tr. 14:14–21; 17:12–18:2.

9

Blue Chip's allegedly enforceable commitment to provide funding (which it later sought to avoid) as a concession to Board member Mark Wright, who was also a Blue Chip affiliate.[44]  As Plaintiff sees it, this would reflect a subjugation of the corporation's interests to those of a Board member in clear violation of the duty of loyalty.[45]  Linkable views the evidence differently and maintains that it abandoned the financing because it believed Blue Chip's terms to be too onerous.[46]

Plaintiff has met its low "credible basis" burden on this issue.  The evidence demonstrates that Linkable was in desperate need of cash when the Blue Chip financing was abandoned.[47]  Linkable's decision not to attempt to enforce the term sheet Blue Chip had signed is at least questionable, and Plaintiff has raised a valid concern that Blue Chip's presence on the Board may have improperly influenced the decision not to enforce the term sheet.  While there certainly are explanations for not

---

[44] *Id.*

[45] *See Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939) ("A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest.").

[46] JX 16 at 1–2; Tr. 59:1–60:17.

[47] JX 15; JX 23 at 18.

10

pursuing the Blue Chip financing that do not involve mismanagement or wrongdoing, Plaintiff has presented some evidence that, in the midst of the imminent demise of the Company, the Board elected not to pursue Linkable's rights to access capital for reasons other than the best interests of the Company and its stockholders.[48]

Plaintiff has requested all documents surrounding this abandoned funding.[49] Investigating whether Board members elevated Blue Chip's interests over the Company's will require reviewing all Board level documents concerning the transaction. To the extent responsive documents take the form of emails or other electronic documents, Plaintiff is entitled to those as well.[50]

---

[48] *Kosinski*, 214 A.3d at 953. To reiterate, I have made no finding that not pursuing the Blue Chip financing was likely the result of fiduciary misconduct, only that Plaintiff has met his burden of demonstrating a credible basis to suspect wrongdoing. I make this finding, in part, based on the lack of evidence in the record that would cogently explain the Board's decision ultimately not to clinch the financing it had worked so hard to arrange.

[49] Demand at 3–4.

[50] *KT4 P'rs LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 756 (Del. 2019) ("But when a [plaintiff] reasonably identifies the documents it needs and provides a basis for the court to infer that those documents likely exist in the form of electronic mail, the [defendant] corporation cannot insist on a production order that excludes emails even if they are in fact the only responsive corporate documents that exist and are therefore by definition necessary.").

## B. The Collinson Sale

Plaintiff next argues it has shown a credible basis to infer "the Collinson transaction was the result of self-dealing on the part of Linkable's officers and directors."[51] In this regard, Plaintiff focuses on the fact that Linkable co-founder and director, Francis Correra, entered into a consulting agreement with Collinson after the transaction, and argues this arrangement provides a credible basis to infer a duty of loyalty breach.[52] I disagree.

Paraflon has not met its burden of showing a credible basis to suspect the Collinson sale involved non-exculpated wrongdoing. The record is devoid of evidence that Correra dominated or controlled the Board, giving him the *de facto* power to control the transaction.[53] Linkable has provided evidence that the Collinson transaction was only agreed to after a vigorous, arms-length sales process.[54] Paraflon was kept abreast of developments while Linkable was conducting the sale, and has not provided any evidence that the process was tainted.[55]

---

[51] RB 11.

[52] *Id.*; JX 37.

[53] Tr. 73:14–75:17. Plaintiff's argument that it would need discovery in order to determine if the Board was dominated by Correra, and therefore it need not articulate a credible basis of wrongdoing to obtain documents, has been specifically rejected by our Supreme Court. *Seinfeld*, 909 A.2d at 121–23.

[54] JX 43 ¶ 28.

[55] *Id.* at ¶ 31; JX 34; JX 35.

Nor has Paraflon offered any evidence there was a topping bid that Linkable rejected. In the face of an otherwise robust sales process, the mere fact that Correra secured a short-term consulting role with Collinson post-closing does not provide a credible basis to suspect wrongdoing.[56]

## C. Copies of Corporate Contracts

Paraflon alleges it was induced to invest in Linkable by Burgess representing to Sarkesian that Linkable had entered into several contracts with prominent retailers.[57] Linkable has apparently refused to produce copies of those contracts for Paraflon to review. Paraflon now suspects those contracts do not exist, and asks this Court to order their inspection.[58] Linkable responds that this Court should not order production of the contracts because, as a threshold issue, the request for their inspection was not presented in the Demand.[59]

---

[56] JX 37 ("This Agreement shall continue . . . for a period of 90 days, or until terminated by either of the Parties . . . ."). To reiterate, the rejection of the Blue Chip financing allows an inference of potential wrongdoing because Defendant did not adequately explain why, in the face of insolvency, the funding was rejected. Here, Defendant offered evidence that the Collinson transaction was the product of an arms-length process, successfully rebutting any inference of wrongdoing that Correra's consulting agreement may have allowed.

[57] JX 25 at 9; JX 45 ¶ 4.

[58] JX 44 ¶ 4; RB 8.

[59] Def.'s Revised Answering Pretrial Br. ("AB") 23.

As a matter of law, Linkable does not have to produce these contracts. Striking the proper balance between a stockholder's inspection rights and the right of a company's board to manage the corporation without undue interference from stockholders is a core principle in our Section 220 jurisprudence.[60] Limiting inspection to what is specified in a demand letter is a key way of maintaining that balance.[61] A corporate board is entitled to be informed of exactly what the stockholder is demanding to inspect so it can make the call, before litigation, whether to allow inspection or litigate the demand.[62] Holding that inspection will not be ordered unless a request is presented in the stockholder's inspection demand preserves this balance and prevents a demand letter from turning into an iterative, ongoing request for production.[63]

## III. CONCLUSION

For the foregoing reasons, Defendant shall produce the documents surrounding the Blue Chip transaction. Judgment will be entered for Defendant with

---

[60] *Seinfeld*, 909 A.2d at 123.

[61] *In re Facebook, Inc. Section 220 Litig.*, 2019 WL 2320842, at *17 (Del. Ch. May 30, 2019); *Fuchs Family Tr. v. Parker Drilling Co.*, 2015 WL 1036106, at *4 (Del. Ch. Mar. 4, 2015).

[62] *Facebook*, 2019 WL 2320842, at *17.

[63] *See Thomas Betts & Corp. v. Leviton Mfg. Co., Inc.*, 685 A.2d 702, 712 (Del. Ch. 1995) ("A stockholder may not use the 220 action as a means to invade the corporate board room.") (quotation omitted).

respect to each other request.  The parties shall confer and provide this Court with an implementing order within ten (10) days.